# SUPREME COURT OF GEORGIA

## Case No. S24A0726, S24A0772

October 31, 2024

**GEORGIA ASSOCIATION OF CLUB EXECUTIVES, INC. v. STATE OF GEORGIA.**
**GEORGIA ASSOCIATION OF CLUB EXECUTIVES, INC. v. FRANK O'CONNELL, COMMISSIONER**

Upon consideration, the deadline for a motion for reconsideration in this case has been revised. It is ordered that a motion for reconsideration, if any, must be filed no later than **4:30 pm on Wednesday, November 6, 2024**.

**SUPREME COURT OF THE STATE OF GEORGIA**

Clerk's Office, Atlanta

I certify that the above is a true extract from the minutes of the Supreme Court of Georgia.

Witness my signature and the seal of said court hereto

affixed the day and year last above written.

_Thérèse S. Barnes_ , Clerk

In the Supreme Court of Georgia

Decided: October 31, 2024

S24A0726. GEORGIA ASSOCIATION OF CLUB EXECUTIVES,
INC. v. STATE OF GEORGIA
S24A0772. GEORGIA ASSOCIATION OF CLUB EXECUTIVES,
INC. v. FRANK O'CONNELL, COMMISSIONER

PETERSON, Presiding Justice.

Georgia local governments have often imposed total bans on adult entertainment establishments offering the combination of nude dancing and serving alcohol. We have often upheld those bans against First Amendment challenges. See *Maxim Cabaret, Inc. v. City of Sandy Springs*, 304 Ga. 187, 193-194 (III) (816 SE2d 31) (2018); *Oasis Goodtime Emporium I, Inc., v. City of Doraville*, 297 Ga. 513, 525 (3) (c) (1) (773 SE2d 728) (2015); *Trop, Inc. v. City of Brookhaven*, 296 Ga. 85, 88 (1) (764 SE2d 398) (2014); *Chambers v. Peach County*, 268 Ga. 672, 674 (2) (492 SE2d 191) (1997); *Goldrush II v. City of Marietta*, 267 Ga. 683, 692-693 (5) (482 SE2d 347) (1997);

*Gravely v. Bacon*, 263 Ga. 203, 207 (2) (429 SE2d 663) (1993). In this case, the State stopped short of a total ban, imposing instead a 1% tax on gross revenue on adult entertainment establishments that choose to offer the combination of nude dancing and serving alcohol. The adult entertainment establishments raised a First Amendment challenge against the tax, and the trial court upheld it. So do we.

The Georgia Association of Club Executives ("GACE"), a self-described "organization of adult entertainment clubs in Georgia," challenges the constitutionality of a "state operating assessment" imposed by OCGA § 15-21-209 (the "Assessment" or "Tax") on "adult entertainment establishments" as defined by OCGA § 15-21-201 (1) (A). The General Assembly passed the Assessment to create and fund the Safe Harbor for Sexually Exploited Children Fund, see OCGA § 15-21-209 (c), with the purpose of helping child victims of sexual exploitation, finding that adult entertainment establishments were a "point of access" by which individuals seeking to sexually exploit children use such establishments as a means of "locating children" to sexually exploit. Ga. L. 2015, p. 675 § 1-2.

3

GACE makes two main arguments on appeal. First, GACE argues that the tax seeks to regulate content, is therefore content-based, and fails to meet strict-scrutiny; GACE also argues alternatively that, if intermediate scrutiny applies, the tax fails the tailoring prong of that test. Second, GACE argues that the definition of "adult entertainment establishments" relating to nude dancing is overbroad.

We reject GACE's argument that strict scrutiny applies. We assume without deciding that the Assessment is subject to intermediate scrutiny. We hold that it is content-neutral and satisfies intermediate scrutiny. We also conclude that GACE's overbreadth challenge fails. We therefore affirm.

1. *Background*

GACE describes itself as an "organization of adult entertainment clubs in Georgia" and asserts that its members are subject to the "state operating assessment" imposed by OCGA § 15-21-209 (a) because they are "adult entertainment establishments"

4

as defined by OCGA § 15-21-201 (1) (A).[1]

(a) *The Assessment*

OCGA § 15-21-209 (a)[2] says:

By April 30 of each calendar year, each adult entertainment establishment shall pay the commissioner of revenue a state operation assessment equal to 1 percent of the previous calendar year's gross revenue or $5,000.00. This state assessment shall be in addition to

---

[1] No individual member joined the suit, so GACE's only basis for standing is under the doctrine of "associational standing." See *Sawnee Elec. Membership Corp. v. Ga. Dept. of Revenue*, 279 Ga. 22, 24 (3) (608 SE2d 611) (2005) ("Associational standing permits an association that has suffered no injury to sue on behalf of its members when the members would otherwise have standing to sue in their own right; the interests the association seeks to protect are germane to the association's purpose; and neither the claim asserted nor the relief requested requires the participation in the lawsuit of the individual members."). We adopted this federal doctrine in *Aldridge v. Georgia Hospital & Travel Association*, 251 Ga. 234 (304 SE2d 708) (1983), without any analysis, see id. at 236 (1), and have since noted that we have never meaningfully addressed whether this doctrine is viable under Georgia law. See *Sons of Confederate Veterans v. Henry County Bd.of Commrs.*, 315 Ga. 39, 66 (2) (d) (ii) n.24 (880 SE2d 168) (2022). The viability of that doctrine has not been raised by the parties, and we decline to reconsider sua sponte the doctrine in this case.

[2] OCGA § 15-21-209 was passed in 2015. In November 2016, Georgia voters voted to amend the Georgia Constitution to allow for the Assessment. See Ga. Const. of 1983, Art. III, Sec. IX, Par. VI (o) ("The General Assembly . . . may impose assessments on adult entertainment establishments as defined by law; and . . . may provide by general law for the allocation of such assessments . . . to the Safe Harbor for Sexually Exploited Children Fund for the specified purpose of meeting any and all costs, or any portion of the costs, of providing care and rehabilitative and social services to individuals in this state who have been or may be sexually exploited."). The Assessment went into effect on January 1, 2017.

any other fees and assessments required by the county or municipality authorizing the operation of an adult entertainment business.

The funds collected by the Assessment are deposited into the Safe Harbor for Sexually Exploited Children Fund. See OCGA § 15-21-209 (c). The money in the fund may be used "for purposes of providing care, rehabilitative services, residential housing, health services, and social services . . . to sexually exploited children" and to fund "a person, entity, or program devoted to awareness and prevention of becoming a sexually exploited child." OCGA § 15-21-202 (c).[3]

Under OCGA § 15-21-201 (1) (A),[4] an "adult entertainment

---

[3] The money may also be used for "the actual and necessary operating expenses" of the commission charged with disbursing money from the fund, but the "primary purpose of the fund . . . is to disburse money to provide care and rehabilitative and social services for sexually exploited children." OCGA § 15-21-202 (c).

[4] Although GACE raised a constitutional overbreadth argument relating to the definition of "adult entertainment establishment" under OCGA § 15-21-201 (1) (B), it does not challenge the trial court's rulings on that issue. Instead, the focus of GACE's arguments on appeal relate to an "adult entertainment establishment" under OCGA § 15-21-201 (1) (A), so our analysis here is limited to that sub-paragraph.

6

establishment" is defined as

> any place of business or commercial establishment where alcoholic beverages of any kind are sold, possessed, or consumed wherein . . . [t]he entertainment or activity therein consists of nude or substantially nude persons[5] dancing with or without music or engaged in movements of a sexual nature or movements simulating sexual intercourse, oral copulation, sodomy, or masturbation[.]

In the bill codifying the code provisions related to the Assessment, the General Assembly made specific findings, including:

> [I]t is necessary and appropriate to adopt uniform and reasonable assessments and regulations to help address the deleterious secondary effects, including but not limited to, prostitution and sexual exploitation of children, associated with adult entertainment establishments that allow the sale, possession, or consumption of alcohol on premises and that provide to their patrons performances and interaction involving various forms of nudity. The General Assembly finds that a correlation exists between adult live entertainment establishments and the sexual exploitation of children. The General Assembly finds that adult live entertainment establishments present a point of access for children to come into contact with individuals seeking

---

[5] "Substantially nude" is defined as "dressed in a manner so as to display any portion of the female breast below the top of the areola or displaying any portion of any person's pubic hair, anus, cleft of the buttocks, vulva, or genitals." OCGA § 15-21-201 (7).

to sexually exploit children. The General Assembly further finds that individuals seeking to exploit children utilize adult live entertainment establishments as a means of locating children for the purpose of sexual exploitation. The General Assembly acknowledges that many local governments in this state and in other states found deleterious secondary effects of adult entertainment establishments are exacerbated by the sale, possession, or consumption of alcohol in such establishments.

Ga. L. 2015, p. 675 § 1-2. The Act also stated:

The purpose of this Act is to protect a child from further victimization after he or she is discovered to be a sexually exploited child by ensuring that a child protective response is in place in this state. The purpose and intended effect of this Act in imposing assessments and regulations on adult entertainment establishments is not to impose a restriction on the content or reasonable access to any materials or performances protected by the First Amendment of the United States Constitution or Article I, Section I, Paragraph V of the Constitution of this state.

Id.

(b) *Procedural History of GACE's Challenges*

In November 2017, GACE filed a lawsuit challenging the constitutionality of the Assessment and naming the Department of Revenue Commissioner Lynnette Riley in her individual capacity as

8

the defendant.[6]

In its initial complaint, GACE argued that the Assessment is a "content-based tax" that is "contrary to the First Amendment of the United States Constitution." GACE sought a declaratory judgment declaring that "the tax is an unconstitutional restriction on free speech," unconstitutionally vague, and also requested injunctive relief.[7] The trial court entered orders in 2020 concluding that part of OCGA § 15-21-201 was void for vagueness, that part was subject to severance, and all other portions of the Assessment were constitutional and enforceable. Riley and GACE each filed notices of appeal to this Court.

On appeal, this Court vacated the trial court's orders and

---

[6] GACE also named the Attorney General Christopher Carr in his individual capacity as a defendant. In July 2018, the trial court dismissed the action with respect to Carr, concluding that he was not a proper defendant because he was not the state officer charged with administering the tax and revenue statutes. GACE did not challenge that dismissal.

[7] The complaint also alleged that the Act creating the Assessment impermissibly pertained to multiple, unrelated subject matters in violation of the Georgia Constitution's single-subject rule. In July 2018, the trial court dismissed that count for failure to state a claim. GACE did not appeal that ruling.

remanded with direction to dismiss Riley from the case on the ground that the action against Riley was moot because Riley, who had been sued in her individual capacity and was no longer the State Revenue Commissioner, "could not give GACE the relief it seeks." *Riley v. Georgia Assn. of Club Executives*, 313 Ga. 364, 367 (870 SE2d 405) (2022). On remand, GACE amended its complaint to substitute Robyn Crittenden, in her individual capacity as the then-current Revenue Commissioner, as the defendant in place of Riley, and to add a claim that OCGA § 15-21-201 (1) (A) was unconstitutionally overbroad. When Frank O'Connell replaced Crittenden as Revenue Commissioner, GACE filed a third amended complaint naming O'Connell as a defendant in place of Crittenden. Both GACE and O'Connell filed motions for summary judgment based on the third amended complaint.

While this litigation against the Revenue Commissioner was pending, GACE filed a separate case against the State of Georgia, in March 2022, raising the same arguments challenging the Assessment as raised in the case against the Revenue Commissioner

and also asserting that the recent constitutional amendment in Article I, Section II, Paragraph V of the Georgia Constitution waived the State's sovereign immunity "at least to all efforts to collect the [Assessment] based on [GACE]'s member clubs' activities that occurred on or after January 1, 2021 or that will occur in the future."[8] Both parties filed motions for summary judgment in this second case.

In December 2023, the trial court decided both cases, granting O'Connell's and the State's motions for summary judgment and

---

[8] In November 2020, the people of Georgia ratified Act 596 (H.R. No. 1023) to add to Georgia's Constitution a waiver of sovereign immunity applicable in circumstances like those presented here. This waiver is codified in Article I, Section II, Paragraph V of Georgia's Constitution and says:

(b) (l) Sovereign immunity is hereby waived for actions in the superior court seeking declaratory relief from acts of the state or any agency, authority, branch, board, bureau, commission, department, office, or public corporation of this state or officer or employee thereof or any county, consolidated government, or municipality of this state or officer or employee thereof outside the scope of lawful authority or in violation of the laws or the Constitution of this state or the Constitution of the United States. Sovereign immunity is further waived so that a court awarding declaratory relief pursuant to this Paragraph may, only after awarding declaratory relief, enjoin such acts to enforce its judgment. Such waiver of sovereign immunity under this Paragraph shall apply to past, current, and prospective acts which occur on or after January 1, 2021.

11

denying GACE's motions. Adopting the same reasoning in both cases, the court explained that the Assessment was used to create a fund to combat sex trafficking and help victims and that "there is a well-established link between adult-entertainment establishments and prostitution." The court concluded that intermediate scrutiny applied to its analysis of the Assessment, which "has only an incidental impact on protected expression" and is targeted at negative secondary effects of that protected expression. The court held that OCGA § 15-21-209 (a) and the Assessment passed intermediate scrutiny because "[t]hey further an important governmental interest in reducing sex trafficking and the exploitation of minors; their express purpose is unrelated to the suppression of speech; and any incidental restriction of the expressive 'speech' of nude dancing is no greater than essential to further the important governmental interest." The court also concluded that OCGA § 15-21-201 (1) (A) is not overbroad. GACE filed a notice of appeal in both cases.

2. *The Assessment does not impermissibly burden GACE's*

*speech.*

GACE argues that the Assessment violates the First Amendment of the United States Constitution because it impermissibly burdens the protected expression of nude dancing. We hold that the Assessment is not subject to strict scrutiny because it is content-neutral and not the kind of tax to which the Supreme Court has applied strict scrutiny. We assume without deciding that the Assessment is subject to intermediate scrutiny. We hold that the Assessment satisfies intermediate scrutiny. Thus, the Assessment does not impermissibly burden speech.[9]

(a) *GACE bears the burden of showing that the Assessment's alleged constitutional infirmities are "clear and palpable."*

We begin by noting the heavy burden that GACE bears in asserting in Georgia courts a challenge to a state statute as unconstitutional.

> We presume that statutes are constitutional, and before an act of the General Assembly can be declared unconstitutional, the conflict between it and the

---

[9] The First Amendment to the United States Constitution prohibits the government from making a law "abridging the freedom of speech, or of the press." U.S. Constitution, Amendment I.

fundamental law must be clear and palpable and this Court must be clearly satisfied of its unconstitutionality. Because all presumptions are in favor of the constitutionality of a statute, the burden is on the party claiming that the law is unconstitutional to prove it.

*Session v. State*, 316 Ga. 179, 191 (4) (887 SE2d 317) (2023) (quoting

*Ammons v. State*, 315 Ga. 149, 163 (3) (880 SE2d 544) (2022)). This

burden applies to challenges under the United States and Georgia

Constitutions alike. See *Session*, 316 Ga. at 191 (4) (evaluating

challenge to statute under Georgia Constitution); *S&S Towing &*

*Recovery, Ltd. v. Charnota*, 309 Ga. 117, 118 (1) (844 SE2d 730)

(2020) (evaluating challenge to statute under Fourteenth

Amendment of United States Constitution and stating that the

statute could be held unconstitutional only if "the conflict between

it and the fundamental law" was "clear and palpable").

(b) *Because the Assessment is aimed at addressing negative "secondary effects" of establishments featuring nude dancing, rather than the content of the expression, the Assessment is content-neutral.*

We begin our consideration of the applicable standard under

the First Amendment by noting the absence of precedent providing

on-point guidance. The parties do not cite, and we have not found,

14

any federal appellate decision (much less from the Supreme Court) considering a First Amendment challenge to a tax on adult entertainment establishments like the one at issue here. Most cases addressing regulations of sexually oriented business, such as zoning and licensing requirements, involve complete prohibitions on the combination of nudity (or semi-nudity) and alcohol. See, e.g., *Oasis Goodtime Emporium I*, 297 Ga. at 525 (3) (b); *Maxim Cabaret*, 304 Ga. at 193-194 (III); *Trop*, 296 Ga. at 88 (1); *Chambers*, 268 Ga. at 674 (2); *Goldrush II*, 267 Ga. 683 at 692-693 (5); *Gravely*, 263 Ga. at 207 (2). And the cases addressing the First Amendment limitations on taxation since the Supreme Court's adoption of intermediate scrutiny in *United States v. O'Brien*, 391 U.S. 367 (88 SCt 1673, 20 LE2d 672) (1968), primarily relate to taxes levied against the press. See, e.g., *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221 (107 SCt 1722, 95 LE2d 209) (1987); *Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue*, 460 U.S. 575 (103 SCt 1365, 75 LE2d 295) (1983). And the handful of our sister courts to address similar taxation schemes have arrived at different

15

conclusions regarding the applicable legal framework. See *Bushco v. Utah State Tax Comm.*, 225 P3d 153, 163-164 (Utah 2009) (analyzing constitutionality of tax under intermediate scrutiny as articulated in *O'Brien*); *Combs v. Texas Ent. Ass., Inc.*, 347 SW3d 277, 288 (Tex. 2011) (same); *Deja Vu Showgirls of Las Vegas, LLC v. Nev. Dep't of Taxation*, 334 P3d 392, 401-402 (Nev. 2014) (analyzing constitutionality of tax under rational basis review). At least some of the disagreement between us and the dissent is a natural byproduct of this lack of clear precedent.

As relevant to this appeal, the Assessment applies to establishments where alcohol is sold and where "the entertainment or activity therein consists of nude or substantially nude persons dancing with or without music or engaged in movements of a sexual nature or movements simulating sexual intercourse, oral copulation, sodomy, or masturbation." OCGA § 15-21-201 (1) (A). The nude dancing referenced in OCGA § 15-21-201 (1) (A) is a form of expressive conduct that is protected by the First Amendment of the United States Constitution, although only barely. See *Barnes v.*

16

*Glen Theatre, Inc.*, 501 U.S. 560, 565-566 (111 SCt 2456, 115 LE2d 504) (1991) ("[N]ude dancing of the kind sought to be performed here is expressive conduct within the outer perimeters of the First Amendment, though we view it as only marginally so."); *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (120 SCt 1382, 146 LEd2d 265) (2000) ("[N]ude dancing of the type at issue here is expressive conduct, although we think that it falls only within the outer ambit of the First Amendment's protection.").

GACE argues that the Assessment is content-based because it applies only to clubs that feature nude dancing conveying an erotic message. Specifically, GACE notes that the Assessment applies when the nude dancing is provided as "entertainment" and when nude performers are "engaged in movements of a sexual nature or movements simulating sexual intercourse, oral copulation, sodomy, or masturbation." OCGA § 15-21-201 (1) (A). GACE argues that because the Assessment is content-based, it is subject to a strict scrutiny test, "which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to

17

achieve that interest." *Reed v. Town of Gilbert*, 576 U.S. 155, 171

(135 SCt 2218, 192 LE2d 236) (2015) (citation and punctuation

omitted). We disagree and conclude that the Assessment is content-

neutral.

> The principal inquiry in determining whether a legislative act is content-neutral is whether the government has adopted a regulation of speech because of disagreement with the message it conveys. The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others.

*Oasis Goodtime Emporium I*, 297 Ga. at 521 (3) (a) (punctuation

omitted). The United States Supreme Court has explained that

when an ordinance "is aimed not at the *content*" of adult

entertainment, but "rather at the *secondary effects*" of

establishments that feature adult entertainment, the "ordinance is

completely consistent with [the] definition of 'content-neutral'

speech regulations as those that 'are *justified* without reference to

the content of the regulated speech.'" *City of Renton v. Playtime*

*Theaters, Inc.,* 475 U.S. 41, 47 (106 SCt 925, 89 LE2d 29) (1986)

18

(emphasis in original); see also *Oasis Goodtime Emporium I*, 297 Ga. at 521 (3) (a) ("An ordinance designed to combat the undesirable secondary effects of sexually explicit businesses is content-neutral.").

Here, the Assessment clearly fits within the category of laws that are aimed at the "secondary effects" of adult establishments featuring certain protected expression rather than at the content of the expression itself. First, the General Assembly made clear that it did not intend to regulate expression protected by the First Amendment: "The purpose and intended effect of this Act in imposing assessments and regulations on adult entertainment establishments is not to impose a restriction on the content or reasonable access to any materials or performances protected by the First Amendment of the United States Constitution or Article I, Section I, Paragraph V of the Constitution of this state." Ga. L. 2015, p. 675 § 1-2. Instead, the General Assembly explained in its legislative findings that the Assessment's objective is to "address the deleterious secondary effects . . . associated with adult

19

entertainment establishments that allow the sale, possession, or consumption of alcohol" by funding a "protective response" through assessments imposed on the industry responsible for those secondary effects. Id.; see also OCGA § 15-21-209 (c). Thus, because the purpose of the Assessment is to address the undesirable secondary effects of adult entertainment establishments, we assume without deciding that intermediate scrutiny applies. See, e.g., *Maxim Cabaret*, 304 Ga. at 192 (III) (concluding that the regulation designed to combat the secondary effects caused by the combination of alcohol and live nudity was subject to intermediate scrutiny).

GACE contends that the secondary effects doctrine has "been applied exclusively in regulatory contexts, often related to land use or licensing." Thus, GACE argues, because the Assessment is a tax and because the Supreme Court "has taken a negative, bright-line attitude toward taxation that discriminates based on protected expression," the Assessment must satisfy strict scrutiny. But the United States Supreme Court has held that a tax "discriminat[ing] among speakers is constitutionally suspect only in certain

circumstances": (1) if it "single[s] out the press[,]" (2) "if it targets a small group of speakers[,]" or (3) "if it discriminates on the basis of the content of taxpayer speech." *Leathers v. Medlock*, 499 U.S. 439, 444-447 (111 SCt 1438, 113 LE2d 494) (1991). GACE does not argue that the adult entertainment establishments subject to the Assessment are part of the press, and we have already concluded that the Assessment is content-neutral. As to whether the Assessment targets a small group of speakers, it is true that the Assessment applies only to certain establishments, but it applies to a significant percentage of establishments within the category of adult live entertainment establishments as a whole, not a small, select few. See *Turner Broadcasting Systems, Inc. v. F.C.C.*, 512 U.S. 622, 661 (114 SCt 2445, 129 LE2d 497) (1994) (describing regulations as "broad based, applying to almost all cable systems in the country, rather than just a select few" in concluding that strict scrutiny did not apply); see also *Nat'l Amusements, Inc. v. Town of Dedham*, 43 F3d 731, 740 (1st Cir. 1995) ("Under appellant's formulation, any regulation that has an effect on fewer than all First

21

Amendment speakers or messages could be deemed to be a form of targeting and thus subjected to strict scrutiny. Yet the Supreme Court has recognized that a municipality lawfully may enact a regulation that 'serves purposes unrelated to the content of expression . . . even if it has an incidental effect on some speakers or messages but not others.'" (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (109 SCt 2746, 105 LEd2d 661) (1989))). Thus, the Assessment does not fall within the three categories of taxes identified in *Leathers* as "constitutionally suspect," and strict scrutiny does not apply.

The Defendants, on the other hand, cite *Leathers* to support their contention that the Assessment does not implicate the First Amendment at all. Because we conclude that the Assessment satisfies intermediate scrutiny, we do not reach the question of whether the Assessment need satisfy only a less-exacting test. We do note, however, that at least one court to consider a similar tax held that the tax it was reviewing was subject only to rational basis review. *Deja Vu Showgirls of Las Vegas, LLC*, 334 P3d at 399-402

(upholding under rational basis review a tax on live entertainment with many exemptions for "family-oriented" entertainment).

(c) *The intermediate scrutiny test.*

Where "the governmental purpose in enacting the [speech-burdening] regulation is unrelated to the suppression of expression," the regulation needs to satisfy the intermediate scrutiny test articulated in *O'Brien. City of Erie*, 529 U.S. at 289; see also *Turner Broadcasting Systems, Inc. v. F.C.C.*, 520 U.S. 180, 189 (117 SCt 1174, 137 LE 2d 369) (1997) (describing *O'Brien* test as "intermediate scrutiny"); *Maxim Cabaret*, 304 Ga. at 192 (III) (citing *O'Brien* when describing intermediate scrutiny). Under *O'Brien*, a content-neutral law may be constitutional under the First Amendment: "[1] if it is within the constitutional power of the Government; [2] if it furthers an important or substantial governmental interest; [3] if the governmental interest is unrelated to the suppression of free expression; and [4] if the incidental restriction on alleged First Amendment freedoms is no greater than

is essential to the furtherance of that interest." 391 U.S. at 377.[10]

  i. *The Assessment is within the General Assembly's Constitutional power.*

As to the first prong, there is no dispute that it is "within the constitutional power" of the General Assembly to impose taxes. See

---

[10] In *Paramount Pictures Corp. v. Busbee*, 250 Ga. 252 (297 SE2d 250) (1982), a case that dealt with claims based only on the Georgia Constitution, this Court cited *O'Brien* when holding that "content-neutral legislation" is constitutional "if it furthers an important government interest; if the government interest is unrelated to the suppression of speech; and if the incidental restriction of speech is no greater than is essential to the furtherance of that interest." *Paramount Pictures*, 250 Ga. at 255-256 (1). While at first blush this articulation of the test appears to miss the first prong, that is only because no party contended that the regulation at issue there was beyond the constitutional power of the government to impose. See generally id. This Court has cited both *O'Brien* and *Paramount Pictures* in addressing free speech challenges brought under the United States and Georgia Constitutions. And although the test this Court laid out in *Paramount Pictures* and later cases applying intermediate scrutiny does not expressly recite *O'Brien*'s first prong, our Court has treated the *Paramount Pictures* test as consistent and coextensive with the *O'Brien* test. See *Goldrush II*, 267 Ga. at 690 (3) (explaining, before applying the *Paramount Pictures* test to a challenge under both the United States and Georgia Constitutions, that the "application of our tripartite *Paramount Pictures* test or the First Amendment analytical framework from which it is derived remains appropriate for content-neutral legislation"); see also id. at 690 (3) n.8 ("The *Paramount Pictures* three-pronged study of statutes and ordinances to determine whether the free expression guaranty of the Georgia Constitution has been violated is derived from the analytical framework applied by federal courts when measuring legislative enactments against the First Amendment of the U.S. Constitution."); *Maxim Cabaret*, 304 Ga. at 192 (III) (citing *O'Brien* when describing intermediate scrutiny).

24

Ga. Const. of 1983, Art. VII, Sec. I, Par. I ("Except as otherwise provided in this Constitution, the right of taxation shall always be under the complete control of the state.").

ii. *The Assessment furthers an important government interest.*

As to the second prong, the State has an important interest in remedying the secondary effects caused by adult entertainment establishments, and it furthered that interest by creating a fund to support sexually exploited children. But the State's interest is not, as the dissent would have it, merely a general interest in raising revenue to combat these secondary effects. Rather, implicit within the State's interest is an element of seeking not to burden taxpayers in general with the costs of remedying the harm that the adult entertainment industry causes. This element strikes us as clearly implicit within the structure of the challenged statute (imposing the Assessment on the adult entertainment industry) viewed in the light of the State's findings that the secondary effects are caused by that industry. And, indeed, it appears to have struck the trial court similarly. See MSJ Order at 3130-31 ("In other words, GACE is

25

essentially asking the state to subsidize them by covering the costs

of mitigating the secondary effects of their own operations.").[11]

---

[11] Furthermore, contrary to the dissent's assertion, the State's interest in "regulating adult businesses" by reducing the secondary effects of adult entertainment establishments that serve alcohol is clear from the legislative findings. Ga. L. 2015, pp. 675-677 § 1-2 ("The General Assembly finds that it is necessary and appropriate to adopt uniform and reasonable assessments and regulations to help address the deleterious secondary effects, including but not limited to, prostitution and sexual exploitation of children, associated with adult entertainment establishments that allow the sale, possession, or consumption of alcohol on premises and that provide to their patrons performances and interaction involving various forms of nudity. . . . The General Assembly acknowledges that many local governments in this state and in other states *found deleterious secondary effects of adult entertainment establishments are exacerbated by the sale, possession, or consumption of alcohol* in such establishments." (emphasis added)). The dissent's contention that this interest would run afoul of *O'Brien*'s third prong is contrary to the relevant caselaw. See *Combs*, 347 SW3d at 288 (concluding that the State's interest in "reducing the secondary effects of adult businesses" by creating a "disincentive" on the combination of nude dancing and alcohol was "unrelated to the suppression of free expression"); *Oasis Goodtime Emporium I,* 297 Ga. at 525 (3) (c) (1) (concluding that an ordinance prohibiting the combination of even semi-nude dancing and alcohol satisfied the second and third prongs of the *Paramount Pictures* test).

In fact, recognizing that "[s]erving alcohol is not itself protected expression," this Court has repeatedly upheld more restrictive regulations on adult entertainment establishments — including complete bans on the combination of nudity (even semi-nudity) and alcohol. *Oasis Goodtime Emporium I, Inc.*, 297 Ga. at 525 (3) (b); see also, e.g., *Maxim Cabaret*, 304 Ga. at 193-194 (III); *Trop*, 296 Ga. at 88 (1); *Chambers*, 268 Ga. at 674 (2); *Goldrush II*, 267 Ga. at 692-693 (5); *Gravely*, 263 Ga. at 207 (2). Conspicuously absent from the dissent is any explanation (beyond its disagreement on what state interests are properly considered) of how a tax on the combination of alcohol and nude dancing is more offensive to the First Amendment than the multitude of regulations and ordinances imposing outright bans on the combination of alcohol and nude dancing that we have previously upheld.

Although GACE acknowledges that providing resources for sexually exploited children is an "important or substantial government interest,"[12] it contends that the Assessment fails the *O'Brien* test because the legislature did not reasonably rely on evidence connecting adult entertainment establishments with child exploitation.

To demonstrate "a connection between speech and a substantial, independent government interest," the government "may rely on any evidence that is 'reasonably believed to be relevant[.]'" [13] *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S.

---

[12] See *City of Erie*, 529 U.S. at 296 ("The asserted interests of regulating conduct through a public nudity ban and of combating the harmful secondary effects associated with nude dancing are undeniably important."); see also *Maxim Cabaret*, 304 Ga. at 193 (III) (explaining that "attempting to preserve the quality of urban life and reducing criminal activity and preventing the deterioration of neighborhoods" are "important government interests") (cleaned up).

[13] It may not be necessary for the State to point to evidentiary support demonstrating a connection between adult entertainment establishments and child sexual exploitation to satisfy the second prong of the *O'Brien* test. See *City of Erie*, 529 U.S. at 298-299 (noting that the *O'Brien* Court "did not require evidence that the integrity of the Selective Service System would be jeopardized by the knowing destruction or mutilation of draft cards"); *Bushco*, 225 P3d at 165-166 (Although "the Supreme Court, in construing the 'substantial state interest' prong under *Renton* and its other secondary effects

27

425, 438-439 (122 SCt 1728, 152 LE2d 670) (2002) (plurality opinion) (quoting *City of Renton*, 475 U.S. at 50-52).[14] Although the government cannot "get away with shoddy data or reasoning," *Alameda Books*, 535 U.S. at 438, it is not required "to prove the efficacy of the studies" it relies on. See *Parker v. Whitfield County*, 265 Ga. 829, 829 (1) (463 SE2d 116) (1995) (citation and punctuation omitted). "The First Amendment does not require" the State "to conduct new studies or produce evidence independent of that

---

cases, has required parties seeking to justify a regulation of speech under the secondary effects doctrine to establish some level of evidentiary connection between the secondary effects a regulation targets and the speech it regulates, no similar burden of proof exists under the *O'Brien* test."). But because the Defendants have proffered sufficient evidence to satisfy *City of Renton*, it is unnecessary to decide whether the *O'Brien* test permits a lesser evidentiary showing.

[14] The lead opinion in *Alameda Books* was a four-justice plurality opinion, with Justice Kennedy providing a fifth vote for the judgment upholding the challenged regulation but articulating a different test. Notably, however, "Justice Kennedy concurred with the *Alameda Books* plurality opinion penned by Justice O'Connor because he agreed about the quantum of evidence necessary for the government to prove that a challenged law was motivated by a desire to counteract adverse secondary effects." *Flanigan's Enterprises v. City of Sandy Springs*, 703 Fed. Appx. 929, 936 (11th Cir. 2017) (concluding that Justice Kennedy's concurrence was not controlling opinion). This evidentiary standard on which the plurality and Justice Kennedy agreed, which was necessary to the holding and did enjoy the concurrence of five justices, is the only point for which we cite *Alameda Books*.

already generated by other" jurisdictions, as long as the evidence relied upon "is reasonably believed to be relevant to the problem that" the State seeks to address. *City of Renton*, 475 U.S. at 51-52. In short, "very little evidence is required" to satisfy this standard. *Alameda Books*, 535 U.S. at 451 (Kennedy, J., concurring).

To successfully challenge the State's evidence, GACE must either demonstrate that the State's "evidence does not support its rationale" or "furnish[] evidence that disputes the [State's] factual findings." *Alameda Books*, 535 U.S. at 438-439. "If [GACE] succeed[s] in casting doubt on [the State's] rationale in either manner, the burden shifts back to the [State] to supplement the record with evidence renewing support for a theory that justifies its [statute]." Id. at 439.

The studies and evidence relied upon by the General Assembly to demonstrate a connection between adult entertainment establishments and child sexual exploitation are more than sufficient to satisfy the standard articulated in *City of Renton* and *Alameda Books*. For example, the study *Hidden in Plain View: The*

29

*Commercial Sexual Exploitation of Girls in Atlanta,* Atlanta Women's Agenda (2005) found "a strong spatial correlation between areas of adult prostitution activities and juvenile prostitution-related activities," that "[j]uvenile truants and runaways are often found in areas with heavy adult prostitution activities," and most notably, "a spatial association between prostitution-related activities and legal adult sex venues."[15] In the light of these findings, the General Assembly's Commercial Sexual Exploitation of Minors Joint Study Commission concluded in its final report that because of the "frequent proximity between adult entertainment venues and prostitution activity . . . employment in such businesses frequently serve[s] as a stepping stone to prostitution," and that "these businesses often serve as the very location for such illicit transactions." Furthermore, the Commission noted that "there is a strong need for additional in-patient, as well as out-patient, services tailored to the unique needs of [child sexual exploitation] survivors,"

---

[15] The "legal adult sex venues" analyzed in the study included "strip clubs, lingerie modeling venues[,] and sex shops."

and proposed that a "way to raise funds for additional resources would be to place a modest surcharge on patrons to adult entertainment venues, which would be specifically directed toward increased services for victims." Thus, the evidence before the General Assembly demonstrating a connection between child sexual exploitation and adult entertainment establishments "fairly support[ed] the [State's] rationale for [the Assessment]." *Alameda Books*, 535 U.S. at 438.

In response, GACE argues that these studies are flawed and do not in fact establish such a connection. Specifically, GACE contends that "[s]ome studies do not analyze adult entertainment establishments at all; some do not discuss child sex trafficking; [and] some rely on the mere rough spatial proximity between juvenile prostitution arrests and 'adult sex venues[.]'" But as discussed above, *Hidden in Plain View* explicitly analyzed the link between child sexual exploitation and adult entertainment establishments. This alone would be enough to satisfy the State's evidentiary burden. But the General Assembly also relied upon other studies

31

that arrived at similar conclusions. See *Deconstructing the Demand for Prostitution: Preliminary Insights From Interviews With Chicago Men Who Purchase Sex,* Chicago Alliance Against Sexual Exploitation (2008) (finding that 46% of men who purchased sex "indoors" did so at "strip clubs"); *Adolescent Girls in Georgia's Sex Trade: An In-Depth Tracking Study*, Juvenile Justice Group (2008) (noting that researchers found that "[t]here are several small hotels and motels — typically located near strip clubs — where on any weekend night you will find the same group of 10-15 prostitutes, many of whom are young"). Nevertheless, GACE contends that any "spatial association" between adult entertainment establishments and child sexual exploitation may be the result of "past zoning" rather than any "connection to child sex trafficking." But even if the evidence was consistent with both GACE's zoning theory and the General Assembly's "gateway" theory, the General Assembly was not required "to prove that its theory is the only one that can plausibly explain the data[.]" *Alameda Books*, 535 U.S. at 437-438. In other words, although the State "bears the burden of providing

32

evidence that supports a link between" adult entertainment establishments and child sexual exploitation, "it does not bear the burden of providing evidence that rules out every theory for the link . . . that is inconsistent with its own." Id. at 437.

GACE also cites two studies that purport to refute any connection between child sexual exploitation and adult entertainment establishments. We doubt that either study *directly* refutes the General Assembly's gateway and proximity theories derived from the evidence discussed above. But even if GACE "succeed[ed] in casting doubt on [the State's] rationale," the burden would merely shift back to the State "to supplement the record with evidence renewing support for a theory that justifies" the Assessment. *Alameda Books*, 535 U.S. at 439. The live testimony heard by the General Assembly easily satisfies the State's burden. See *City of Erie*, 529 U.S. at 289 (criticizing the dissent for "ignor[ing] Erie's actual experience and instead requir[ing] . . . an empirical analysis"). The General Assembly heard from multiple witnesses who testified that they or victims they knew were initially

trafficked through establishments like strip clubs. In response, GACE contends that the testimony "is out of date or anecdotal." But GACE misconstrues the State's evidentiary burden. See *Daytona Grand, Inc. v. City of Daytona Beach, Fla.*, 490 F3d 860, 881 (11th Cir. 2007) ("Lollipop's argument that the City's evidence is flawed because it consists of 'anecdotal' accounts rather than 'empirical' studies essentially asks this Court to hold today that the City's reliance on anything but empirical studies based on scientific methods is unreasonable. This was not the law before *Alameda Books,* and it is not the law now."); see also *Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, Fla.*, 630 F3d 1346, 1358 (11th Cir. 2011) ("There is no precedent that bars a county from relying on studies that are not empirical in nature."). As the trial court correctly stated, the State is not required to "prove without question that the tax will prevent sexual exploitation. Instead, the evidence need only support a *reasonable belief* that this modest tax will advance the State's interests in protecting victims of child sex exploitation." See *Alameda Books*, 535 U.S. at 451 (Kennedy, J.,

34

concurring) ("As a general matter, courts should not be in the business of second-guessing fact-bound empirical assessments of city planners."). The evidence relied upon by the General Assembly clearly meets this evidentiary standard. Accordingly, the Assessment satisfies the second prong of the *O'Brien* test.

iii. *The State's interest is unrelated to suppressing free expression.*

As to the third prong, the State's interest in "combating the negative secondary effects associated with adult entertainment establishments" is "unrelated to the suppression of free expression." *City of Erie*, 529 U.S. at 296, 301.

iv. *The Assessment's incidental burden on expression promotes the State's interest in a way that would be achieved less effectively absent the Assessment.*

We begin our analysis of the fourth prong by articulating the difference in our understanding of its requirements from that of the dissent. The dissent interprets the language *O'Brien* used to describe its fourth prong as similar to the least-restrictive-means test of strict scrutiny: "the incidental restriction on alleged First Amendment freedoms [must be] no greater than is essential to the

35

furtherance of that interest." *O'Brien*, 391 U.S. at 377.

But more recent decisions of the United States Supreme Court have made clear that reading of *O'Brien* is mistaken. Instead, a burden on expression subject to intermediate scrutiny satisfies the fourth prong if it "promotes a substantial government interest that would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 799 (citation and punctuation omitted).[16] As the *Ward* Court explained, the fourth prong of the *O'Brien* test does not require that the challenged law be "the least restrictive or least intrusive means" of "serv[ing] the government's legitimate, content-neutral interests[.]" Id. at 798; see also *City of Erie*, 529 U.S. at 301-302 (explaining that under the intermediate scrutiny test, a "least restrictive means analysis is not required"). Indeed, the *Ward* Court was considering a lower court's decision that had understood

---

[16] *Ward* considered a time, place, manner restriction on speech, but explained, when considering the tailoring requirement, that the requirements for a time, place, or manner restriction that burdens speech are equivalent to that in *O'Brien*: "[W]e have held that the *O'Brien* test 'in the last analysis is little, if any, different from the standard applied to time, place, or manner restrictions.'" *Ward*, 491 U.S. at 798 (quoting *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 298 (104 SCt 3065, 82 LE2d 221) (1984)).

*O'Brien* as the dissent does, and had invalidated a speech restriction

under intermediate scrutiny because there were alternative ways to

serve the same government interest with less burden on speech. See

*Ward*, 491 U.S. at 798. In reversing that lower court, the *Ward* Court

made clear that the presence of a less-restrictive way of serving the

government interest was not fatal to intermediate scrutiny; "[s]o

long as the means chosen are not substantially broader than

necessary to achieve the government's interest, however, the

regulation will not be invalid simply because a court concludes that

the government's interest could be adequately served by some less-

speech-restrictive alternative."[17] Id. at 800. This is a key distinction

---

[17] The dissent suggests that we may read *Ward* as articulating a test that differs from *O'Brien*'s fourth prong.  We do not. *Ward* did not change anything about *O'Brien*, it simply clarified how its fourth prong was to be applied and reversed a lower court that misread *O'Brien* in the same way that the dissent does. See *Ward*, 491 U.S. at 798-799; see also *City of Erie*, 529 U.S. at 301 ("In any event, since this is a content-neutral restriction, least restrictive means analysis is not required." (citing *Ward*, 491 U.S. at 798-799, n. 6.)); *Turner Broadcasting Systems*, 512 U.S. at 662 ("To satisfy this standard, a regulation need not be the least speech-restrictive means of advancing the Government's interests. 'Rather, the requirement of narrow tailoring is satisfied "so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation."'") (quoting *Ward*, 491 U.S. at 799 (quoting *U.S. v. Albertini*, 472 U.S. 675, 689 (105 SCt 2897, 86 LEd2d 536) (1985))).

between strict and intermediate scrutiny. See *McCullen v. Coakley*, 573 U.S. 464, 478 (134 SCt 2518, 189 LE2d 502) (2014) (explaining that an act that "must satisfy strict scrutiny . . . must be the least restrictive means of achieving a compelling state interest").

A review of the application of *O'Brien*'s fourth prong in other cases from the United States Supreme Court and this Court illustrates what kinds of incidental restrictions on expression are permissible. For example, in *City of Erie*, the United States Supreme Court upheld an ordinance prohibiting nudity in public places, concluding that the requirement burdening speech — i.e., "[t]he requirement that dancers wear pasties or G-strings" — was "a minimal restriction in furtherance of the asserted government interests" and left "ample capacity to convey the dancer's erotic message." 529 U.S. at 301. Although there were "alternative means," such as zoning restrictions, to address the secondary effects caused by nude dancing, the Court reiterated that the consideration of these alternatives was unnecessary because the "least restrictive means analysis [was] not required." Id. at 301-302.

Similarly, in *Ward*, the Court upheld a requirement that performers in a public concert venue use sound equipment provided and controlled by the city because "the city's substantial interest in limiting sound volume is served in a direct and effective way by the requirement that the city's sound technician control the mixing board during performances." 491 U.S. at 800. Thus, because the "alternative regulatory methods hypothesized by the Court of Appeals reflect[ed] nothing more than a disagreement with the city over how much control of volume is appropriate or how that level of control is to be achieved . . . [t]he Court of Appeals erred in failing to defer to the city's reasonable determination that its interest in controlling volume would be best served by" the regulation. Id.

This Court has also applied the *O'Brien* test to evaluate whether prohibitions on the combination of nude dancing and alcohol were sufficiently tailored to further the government's stated interest without unnecessarily burdening protected expression. See, e.g., *Gravely*, 263 Ga. at 207 (2); *Goldrush II*, 267 Ga. at 692-693 (5); *Maxim Cabaret*, 304 Ga. at 193-194 (III). For example, in *Gravely*,

39

we upheld an ordinance banning the sale of alcohol at erotic dance establishments because it "impact[ed] only those modes of expression which, in the experience of local governments, tend to be the focal points of negative effects such as increased crime[.]" 263 Ga. at 205 (1) (citation omitted). Since *Gravely*, this Court has "repeatedly upheld bans on liquor sales in sexually oriented businesses as a method of decreasing the undesirable secondary effects of such businesses with minimal incidental effects on free expression." *Maxim Cabaret*, 304 Ga. at 193 (III); see also *Goldrush II*, 267 Ga. at 692-693 (5) ("[T]he ordinance's application is sufficiently narrowly tailored because it is limited to the modes of expression implicated in the production of negative secondary effects — those establishments that provide alcohol and entertainment requiring an adult entertainment license — thereby exempting mainstream performance houses, museums, or theaters."). In short, when the restriction on protected expression is directly linked to the government's objective to mitigate negative secondary effects, the *O'Brien* test is satisfied, even if an alternative

40

method of accomplishing the government's interest is available. See

*Oasis Goodtime Emporium I,* 297 Ga. at 526 (3) (c) (2) (concluding

that the ordinance prohibiting employees of sexually oriented

businesses from appearing fully nude struck "a constitutionally

permissible fit between the objective of reducing undesirable

secondary effects and the need to protect free speech," even though

the requirement that dancers "wear at least *some* minimal kind of

costume" while dancing imposed "more of a restriction on protected

expression than prohibiting alcohol in the vicinity").[18]

Against this backdrop of binding precedent, we conclude that

the Assessment complies with the fourth prong of the *O'Brien* test.

As the General Assembly's legislative findings and statutory scheme

show, the Assessment's objective is to "address the deleterious

secondary effects . . . associated with adult entertainment

establishments that allow the sale, possession, or consumption of

---

[18] Although *Oasis Goodtime Emporium I* addressed a claim under the Georgia Constitution, our Court analyzed the ordinance at issue under the *Paramount Pictures* test. See *Oasis Goodtime Emporium I*, 297 Ga. at 520 (3) n.11, 523 (3) (b). As noted above, that test is identical, in all material respects, to the *O'Brien* test. See, e.g., *Goldrush II*, 267 Ga. at 690 (3) n.8.

alcohol" by imposing an assessment on the industry responsible for those secondary effects to fund a "child protective response[.]" Ga. L. 2015, pp. 675-677 § 1-2. The State's interest — which includes requiring the industry that "tend[s] to be the focal point[] of negative effects" to fund the remedy for the harm it creates — is thus principally served by a targeted tax. See *Gravely*, 263 Ga. at 205 (1); see also *Bushco*, 225 P3d at 168 ("In this case, the Tax promotes the interest in providing treatment for sex offenders by raising revenue and directing that revenue towards treatment programs."); *Combs*, 347 SW3d at 288 (concluding that a fee on adult entertainment establishments that serve alcohol survived intermediate scrutiny). Like the regulations at issue in *City of Erie* and *Ward*, the Assessment serves the State's interest "in a direct and effective way," satisfying the fourth prong of the *O'Brien* test. See *Ward*, 491 U.S. at 800; *City of Erie*, 529 U.S. at 300-301; see also *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 297 (104 SCt 3065, 82 LE2d 221) (1984) ("None of [the] provisions [of regulation prohibiting camping in certain parks] appears unrelated to the ends

42

that it was designed to serve.").

Moreover, it is not disputed that 100% of the Assessment goes to fund the response to the secondary effects. As *Ward* explained, the "[g]overnment may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Ward*, 491 U.S. at 799. No portion of the burden on speech that the Assessment imposes does not serve to advance the State's goals.

GACE argues that the Assessment fails this prong because there are less burdensome ways of accomplishing the State's interest. Specifically, GACE contends that the State's only interest is "raising revenue to combat a particular social problem" and that "[a] broad-based tax raising the same revenue" would further that interest "without burdening expression." But as we have already explained, GACE mischaracterizes the requirements of intermediate scrutiny and takes too narrow a view of the State's interest.

GACE's argument that the Assessment fails this prong

"because there are less burdensome ways of addressing the [S]tate's interest" and thus "the First Amendment requires that these methods, rather than the [Assessment], be used" is simply an effort to smuggle the least restrictive means requirement from strict scrutiny into intermediate scrutiny. See *Bushco*, 225 P3d at 168. But as we have already explained, the United States Supreme Court has repeatedly stated that *O'Brien* does *not* require the State to adopt the least restrictive means available to serve its asserted interest to satisfy intermediate scrutiny. See *City of Erie*, 529 U.S. at 301-302 ("In any event, since this is a content-neutral restriction, least restrictive means analysis is not required.").[19] Accordingly, the

---

[19] See also, e.g., *McCullen*, 573 U.S. at 486 ("Such a regulation, unlike a content-based restriction of speech, need not be the least restrictive or least intrusive means of serving the government's interests." (citation and punctuation omitted)); *Hill v. Colorado*, 530 U.S. 703, 726 (120 SCt 2480, 147 LE2d 597) (2000) ("As we have emphasized on more than one occasion, when a content-neutral regulation does not entirely foreclose any means of communication, it may satisfy the tailoring requirement even though it is not the least restrictive or least intrusive means of serving the statutory goal."); *Bd. of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 478 (109 SCt 3028, 106 LE2d 388) (1989) ("We uphold such restrictions so long as they are narrowly tailored to serve a significant governmental interest, a standard that we have not interpreted to require elimination of all less restrictive alternatives." (citations and punctuation omitted)); *Int'l Soc'y for Krishna*

44

availability of alternative methods for accomplishing the State's purpose is not indicative of a poor fit between the burden on expression and the State's interest.

Furthermore, GACE's contention that a general tax — which "would no doubt inflict burdens on a greater variety of protected expression" than the targeted tax scheme at issue here — would be less restrictive highlights its misunderstanding of the State's interest.[20] *Bushco*, 225 P3d at 168. The State's interest is *not* merely a general interest in raising revenue to combat a particular harm, i.e., the sexual exploitation of children; the Assessment also furthers the State's interest in ensuring that the industry responsible for that harm, i.e., adult entertainment establishments that serve alcohol,

---

*Consciousness, Inc. v. Lee*, 505 U.S. 672, 707 (112 SCt 2711, 120 LE2d 541) (1992) (Kennedy, J., concurring) ("[W]e have held that to be narrowly tailored a regulation need not be the least restrictive or least intrusive means of achieving an end.").

[20] GACE cites *Minneapolis Star & Tribune Co.*, 460 U.S. at 588-589, and *Arkansas Writers' Project*, 481 U.S. at 229-233, for its assertion that a general tax is a less restrictive alternative and thus evidence that the Assessment is not narrowly tailored. But, as explained above, these cases do not apply here because they involved strict scrutiny rather than *O'Brien*'s intermediate scrutiny test.

rather than the general public, pays for the remedy.[21] Any other interpretation of the State's interest would render the General Assembly's specific findings that adult entertainment establishments are responsible for this particular harm meaningless. When the State's interest is properly framed — as an effort to reduce the harm caused by the secondary effects of adult entertainment establishments and requiring the responsible industry to bear the cost — the close fit between the burdening of expression and the State's interest is apparent.

And, in any event, any burdens on protected expression are relatively de minimis. The Assessment does not prohibit nude dancing, regulate the content of nude dancing, restrict the time, place, or manner of nude dancing, or prohibit the combination of nude dancing and alcohol. Thus, the Assessment is *less* burdensome than the ordinance upheld in *City of Erie*, which imposed a blanket

---

[21] As the Defendants stated during oral argument before this Court, "the State is trying to mitigate the negative social effects caused by these businesses. The narrow tailoring is that it is taxing the businesses that are associated with that negative social impact."

ban on public nudity.[22] See *Bushco*, 225 P3d at 169 ("Since the Tax's impact on protected expression is even less burdensome than the impact of the public nudity ordinance upheld in *Erie,* we determine that the Tax satisfies the 'narrow tailoring' prong of the *O'Brien* test.").

The Assessment requires adult entertainment establishments that serve alcohol and operate for a profit to pay the greater of 1 percent of the previous year's gross revenue or $5,000. See OCGA § 15-21-209 (a). This tax is significantly less burdensome than similar taxes upheld by other courts.[23] See, e.g., *Bushco*, 225 P3d at 158

[22] Despite this, the dissent predicts that our decision today somehow can lead to the "circumvention of the constitutional protections *O'Brien* attempted to safeguard." But notably absent from the caselaw the dissent cites is a single case from this Court or the United States Supreme Court applying intermediate scrutiny to invalidate a regulation on adult entertainment establishments, much less such a case considering a regulation like the one at issue here; all of the cases it cites involving constitutional challenges to regulations affecting adult entertainment upheld those regulations. See, e.g., *Maxim Cabaret*, 304 Ga. at 193-194 (III); *Oasis Goodtime Emporium I, Inc.*, 297 Ga. at 525-526 (3) (c) (1); *Trop*, 296 Ga. at 88 (1); *Chambers*, 268 Ga. at 674 (2); *Goldrush II*, 267 Ga. at 692-693 (5); *Gravely*, 263 Ga. at 207 (2); see also *Alameda Books*, 535 U.S. at 430; *City of Erie*, 529 U.S. at 296-297; *Barnes*, 501 U.S. at 571-572; *City of Renton*, 475 U.S. at 50-52.

[23] Notably, GACE does not argue that the tax's size impacts the Court's analysis, instead arguing that "a *de minimis* tax is subject to the same analysis

(largely upholding a 10 percent tax on gross revenue). And it can be avoided entirely by not serving alcohol or not performing substantially nude. See *Oasis Goodtime Emporium I, Inc.*, 297 Ga. at 525 (3) (b) ("Serving alcohol is not itself protected expression."); *Maxim Cabaret,* 304 Ga. at 193 (III) ("[C]onstitutional protections are extended to speech and expression, not to profits."); *Bushco,* 225 P3d at 168 ("Plaintiffs can avoid the Tax, just like the businesses in *Erie* could avoid the ordinance, simply by having their erotic dancers use G-strings and pasties."); see also *Sensations, Inc. v. City of Grand Rapids*, 526 F3d 291, 299 (6th Cir. 2008) ("The prohibition of full nudity has been viewed as having only a de minimis effect on the expressive character of erotic dancing."). Thus, the Assessment "leaves ample capacity to convey [a] dancer's erotic message," *City of Erie*, 529 U.S. at 301, and leaves GACE's members "free to express themselves as they wish through dance or otherwise."[24] *Oasis*

as a larger tax." Given our conclusion that the Assessment is clearly de minimis, we need not establish a precise threshold at which a tax would constitute an unconstitutional burden on protected expression.

[24] Our analysis assumes that GACE's members are themselves engaged

*Goodtime Emporium I*, 297 Ga. at 525 (3) (c) (1).

In short, like the dozens of other laws, regulations, and ordinances restricting the combination of nudity and alcohol upheld by this Court and the United States Supreme Court, the Assessment satisfies intermediate scrutiny.[25]

3. *GACE's overbreadth claim fails.*

GACE concludes with a brief argument that the Assessment is overbroad because the definition of "adult entertainment establishment" under OCGA § 15-21-201 (1) (A) contains several

---

in protected expression. That assumption strikes some of us as dubious. Although the individuals performing nude dance are clearly engaging in protected expression, the record contains no explanation of how the entities that operate these establishments engage in expressive conduct. But because this issue is not before the Court and because we hold that the Assessment is constitutional, we need not address this issue.

[25] Our holding today is consistent with the holdings of every appellate court decision we have found addressing similar claims about similar assessments. See, e.g., *Bushco*, 225 P3d at 171-172; *Combs*, 347 SW3d at 288; *Deja Vu Showgirls*, 334 P3d at 399-402. GACE points us to one unreported decision of a Texas federal district court arriving at the opposite conclusion regarding the Texas assessment previously upheld by the Texas Supreme Court. See *9000 Airport LLC v. Hegar*, No. 4:23-CV-03131, 2023 U.S. Dist. LEXIS 201337, (S.D. Tex. Nov. 9, 2023). That district court decision is presently on appeal to the Fifth Circuit, we find its reasoning generally unpersuasive, and (unlike here) that court found that the record did not support a conclusion that the assessment was aimed at secondary effects.

vague terms. GACE argues that even though it is not specifically raising a vagueness challenge (the statute is not vague as to GACE's members), an overbreadth challenge may nevertheless use the vagueness of statutory terms in arguing that a statute reaches a substantial amount of protected activity by third parties. GACE argues that the Assessment could apply to venues that feature traditional shows with risqué content or host entertainers known for wearing revealing attire that would qualify as "substantially nude" under OCGA § 15-21-201 (1) (A), as well as hotels or movie theaters (those that serve alcohol) where movies with sexual content is available. We conclude that GACE has not met its burden of establishing that the statute is overbroad.

Under the United States Supreme Court's First Amendment overbreadth doctrine, "a statute is facially invalid if it prohibits a substantial amount of protected speech," *United States v. Williams*, 553 U.S. 285, 292 (128 SCt 1830, 170 LE2d 650) (2008), even if it may constitutionally be enforced against the plaintiff. The doctrine "seeks to strike a balance between" "the threat of enforcement of an

overbroad law that deters people from engaging in constitutionally protected speech" and the concern that "invalidating a law that in some of its applications is perfectly constitutional . . . has obvious harmful effects." Id. Application of the overbreadth is "strong medicine" that should be employed "sparingly and only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (93 SCt 2908, 37 LE2d 830) (1973). Because the doctrine is not to be "casually employed," a challenger must show that a statute's overbreadth is "*substantial,* not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Williams*, 553 U.S. at 292-293 (citation and punctuation omitted). Thus, to succeed on an overbreadth challenge, a challenger "bears the burden of demonstrating, from the text of the law and from actual fact, that substantial overbreadth exists." *Virginia v. Hicks*, 539 U.S. 113, 122 (123 SCt 2191, 156 LE2d 148) (2003) (citation and punctuation omitted).

As an initial point, as we have concluded above, the Assessment has a plainly legitimate sweep (its application to

51

GACE's members). And GACE makes no argument relative to establishments that "consist of" nude dancing, which are those businesses that make up GACE's organization. All that is at issue here, then, is their argument that the definitions of "consists of" and "substantially nude" are overbroad. Although these terms may be imprecise, GACE has not shown that any overbreadth is "substantial" relative to the statute's plainly legitimate sweep.

Ordinarily, the first step in assessing an overbreadth claim is to construe the challenged statute to understand the full extent of its effect on protected expression. See *Scott v. State*, 299 Ga. 568, 570 (1) (788 SE2d 468) (2016). But we need not do so comprehensively here. GACE's overbreadth argument focuses exclusively on a single aspect of the definition of "adult entertainment establishment" contained in OCGA § 15-21-201 (1).

The challenged part of the definition provides that an establishment qualifies (and thus other provisions of the Act then subject it to the Assessment) if "[t]he entertainment or activity therein consists of nude or substantially nude persons dancing with

52

or without music or engaged in movements of a sexual nature or movements simulating sexual intercourse, oral copulation, sodomy, or masturbation[.]" OCGA § 15-21-201 (1) (A). GACE argues that "substantially nude" is very broad, that "consists of" and "movements of a sexual nature" are vague, and together those result in a statutory scope that reaches far more constitutionally protected speech than is permissible. In other words, because "consists of" is undefined, it could reach any entertainment that includes any portion of substantial nudity (e.g., a hotel where a customer can purchase alcohol and rent a movie that includes some nudity). But in context, "consists of" is not nearly as vague as GACE argues, and this dooms the entirety of GACE's argument.

An adult entertainment establishment is subject to the Assessment if its entertainment "consists of" nudity or substantial nudity. "Consists of" generally means "to be composed, made up, or formed [of]." See Webster's Deluxe Unabridged Dictionary, 389 (2d ed. 1983); *Camp v. Williams*, 314 Ga. 699, 702 (2) (a) (879 SE2d 88) (2022) (the ordinary meaning of statutory text can be determined

from a review of dictionary definitions as well as "a broader consideration of context and history"). When used in a statute like this one, "consists of" describes an exhaustive list of essential components. In this sense, "consists of" is very limiting. See *Berryhill v. Ga. Community Support & Solutions*, 281 Ga. 439, 441 (638 SE2d 278) (2006) (noting that the word "include," when used in statutes, had traditionally introduced a nonexhaustive list, but is "now widely used for *consists of*," which when "[u]sed in this limiting sense," introduces "an exhaustive list of all of the components or members that make up the whole" (citation and punctuation omitted)). Thus, for the definition to apply, the entertainment or activity must be composed substantially of "nude or substantially nude persons" doing very specific things. The statute is not triggered by entertainment or activity that *could* include some amount of nudity or substantial nudity. Instead, it applies only to establishments where a material or essential part of the entertainment or activity offered therein is made up of nude or substantially nude activity.

We need not decide precisely how much nude or substantially nude activity be present for entertainment to qualify; the statute makes clear enough that it must be *the* essential component of the entertainment offered by an establishment, and not merely an ancillary component or one of many options. This commonsense understanding of the term necessarily excludes virtually all of GACE's examples, because where the activity is not a material part of the establishment's business, some marginal activity of "substantial nudity" would not trigger the statute. Because the nude or substantially nude activity must be the essential component of the entertainment offered, GACE cannot show that the text of OCGA § 15-21-201 (1) (A) is substantially overbroad.

Nor can it show "from actual fact" that the statutory definition is substantially broad. GACE has raised many hypothetical situations of impermissible applications of the Assessment, but that is, by itself, insufficient to render a statute overbroad. See *Taxpayers for Vincent*, 466 U.S. at 800 ("It is clear . . . that the mere fact that one can conceive of some impermissible applications of a statute is

55

not sufficient to render it susceptible to an overbreadth challenge.").

GACE points to no evidence in the record showing that the Assessment has been applied to mainstream venues or establishments. Significantly, as noted by the trial court, the definition of "adult entertainment establishments," including the definition of "substantially nude," is very similar to definitions used by, among others, the City of Atlanta, Fulton County, DeKalb County, and Cobb County.[26] There is no indication that these

---

[26] See, e.g., Atlanta Code of Ordinances § 16-29.001 (3) (e) (defining "substantially nude" as "dressed in a manner so as to display any portion of the female breast below the top of the areola or displaying any portion of any person's pubic hair, anus, cleft of the buttocks, vulva or genitals"); Fulton County Code of Ordinances § 18-78 (defining "adult entertainment" in part as "displaying of any portion of the areola of the female breast or any portion of his or her pubic hair, cleft of the buttocks, anus, vulva, or genitals"); DeKalb County Code of Ordinances § 15-401 (g) (defining nudity based on "specified anatomical areas," which are "[l]ess than completely and opaquely covered human genitals or pubic region, buttocks, or female breasts below a point immediately above the top of the areola"); Cobb County Code of Ordinances § 78-321 (defining "[s]emi-nude or semi-nudity" as "[t]he showing of the female breast below a horizontal line across the top of the areola and extending across the width of the breast at that point, or the showing of the male or female buttocks"); see also Gwinnett County Code of Ordinances § 18-447 (defining "[s]emi-nude or semi-nudity" as "the showing of the female breast below a horizontal line across the top of the areola and extending across the width of the breast at that point, or the showing of the male or female buttocks"); Sandy Springs Code of Ordinances § 26-22 (defining nudity based, in part, on "[s]pecified anatomical areas" including "[h]uman genitals or pubic region,

56

definitions have ever been applied in an overbroad manner. See *Cheshire Bridge Holdings v. City of Atlanta*, 15 F4th 1362, 1375, 1377-1378 (11th Cir. 2021) (the risk that the definition of "adult entertainment establishment" was overbroad was not substantial relative to the statute's plainly legitimate sweep, especially where there was no evidence that the statute had been applied impermissibly as suggested by the plaintiffs). As a result, GACE has not met its burden of showing "from actual fact, that substantial overbreadth exists."

\*

Because the Assessment imposed on "adult entertainment establishments" as defined in OCGA § 15-21-201 (1) (A) satisfies intermediate scrutiny under *O'Brien* and is not overbroad, GACE's First Amendment claims fail. We therefore affirm the trial court's order denying summary judgment to GACE and granting summary judgment to Defendants.

*Judgments affirmed. All the Justices concur, except Warren, J.,*

---

buttock, or female breast below a point immediately above the top of the areola").

*who dissents, and Pinson, J., disqualified.*

WARREN, Justice.

The sexual exploitation and trafficking of children is a scourge on society. It is appropriate for the General Assembly to address such harms by exercising its lawful authority, and I am glad it has sought to do so. But the question this Court is faced with today is not whether these harms exist; they undoubtedly do. The question we must decide is whether the General Assembly's chosen method of addressing these harms is a lawful exercise of its authority—and in particular, whether it violates the First Amendment to the United States Constitution. Because I would conclude that it does, I respectfully dissent.

1. *The State's asserted interest in passing the Assessment is to provide services to child victims of sexual exploitation—not to financially burden a particular industry in service of that policy objective—and the Assessment must pass intermediate scrutiny based on that interest.*

(a) I disagree with the majority opinion's characterization of the State's interest in this case. And because assessing whether a regulation furthers a government entity's "important or substantial" interest is an integral part of the *O'Brien* intermediate-scrutiny test

that I believe applies (and the majority opinion only assumes applies), it is no surprise that we reach different conclusions about the constitutionality of the Assessment.

As relevant to this appeal, the Assessment applies to a limited group of establishments that are defined in part by the expression they showcase: establishments where "the entertainment or activity therein consists of nude or substantially nude persons dancing with or without music or engaged in" particular movements, OCGA § 15-21-201 (1) (A), and in which alcohol is sold.

The nude dancing performed in the clubs that are members of GACE and that is referenced in OCGA § 15-21-201 (1) (A) has been held by the United States Supreme Court to be a form of expressive conduct protected by the First Amendment of the United States Constitution. See *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 565-566 (111 SCt 2456, 115 LE2d 504) (1991) ("[N]ude dancing of the kind sought to be performed here is expressive conduct within the outer perimeters of the First Amendment, though we view it as only marginally so."); *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (120

SCt 1382, 146 LEd2d 265) (2000) ("[N]ude dancing of the type at issue here is expressive conduct, although we think that it falls only within the outer ambit of the First Amendment's protection."). See also *Gravely v. Bacon*, 263 Ga. 203, 205 (429 SE2d 663) (1993) ("Nude dancing is protected expression under the free speech clause[] of . . . the United States . . . Constitution[]."). It follows that by imposing a "special" financial burden based on the showcasing of nude dancing, the State, via the Assessment, imposes a burden on expression that is protected by the First Amendment. The Assessment is therefore subject to some level of judicial scrutiny under the First Amendment. See *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 641 (114 SCt 2445, 129 LE2d 497) (1994) ("Because the must-carry provisions impose special obligations upon cable operators and special burdens upon cable programmers, some measure of heightened First Amendment scrutiny is demanded.").

I agree with the majority opinion that the Assessment is content-neutral and that the secondary-effects doctrine—a doctrine the United States Supreme Court created to assess laws and

ordinances that are "aimed not at the *content*" of adult entertainment, but "rather at the *secondary effects*" of establishments that feature adult entertainment, *City of Renton v. Playtime Theaters, Inc.,* 475 U.S. 41, 47 (106 SCt 925, 89 LE2d 29) (1986) (emphasis in original)—controls the First Amendment constitutional analysis here.[27] But I part ways with the majority opinion insofar as it assumes, without deciding,[28] that intermediate

---

[27] "Secondary effects" refers to consequences of expression that "happen to be associated" with a certain type of expression. *Boos v. Barry*, 485 U.S. 312, 321 (108 SCt 1157, 99 LE2d 333) (1988) (plurality opinion) (explaining that a "secondary effect" is "a secondary feature that happens to be associated with that type of speech," and distinguishing "secondary effects" from "the direct impact of a particular category of speech," such as "[l]isteners' reactions to speech"). See also *R.A.V. v. City of St. Paul*, 505 U.S. 377, 394 (112 SCt 2538, 120 LE2d 305) (1992) ("Listeners' reactions to speech are not the type of 'secondary effects' we referred to in *Renton*. The emotive impact of speech on its audience is not a 'secondary effect.'") (citations and punctuation omitted); *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 444 (122 SCt 1728, 152 LE2d 670) (2002) (Kennedy, J., concurring) (explaining that "secondary effects" are "unrelated to the impact of the speech on its audience," such as pollution caused by a newspaper factory or an obstructed view caused by a billboard).

[28] Although I have my own concerns about pitfalls of the intermediate scrutiny test—including, as noted below, its sometimes blurry connection to strict scrutiny—this Court has applied intermediate scrutiny in similar cases involving adult entertainment establishments, see, e.g., *Maxim Cabaret*, 304 Ga. at 192, and United States Supreme Court precedent points to applying intermediate scrutiny here. See *Green v. State*, 318 Ga. 610, 611 (898 SE2d

62

scrutiny applies.[29]  See Maj. Op. at 19.  In light of the Assessment's content neutrality and aim at secondary effects, I conclude that the intermediate scrutiny test articulated in *United States v. O'Brien*, 391 U.S. 367 (88 SCt 1673, 20 LE2d 672) (1968), applies.  See *City of Erie*, 529 U.S. at 289 (explaining that if "the governmental purpose in enacting the regulation is unrelated to the suppression of expression, then the regulation need only satisfy the 'less stringent' standard from *O'Brien* for evaluating restrictions on symbolic speech"); *Maxim Cabaret, Inc. v. City of Sandy Springs*, 304 Ga. 187, 191-192 (816 SE2d 31) (2018) ("This Court and the U.S. Supreme Court have held repeatedly that ordinances designed to

---

500) (2024) ("United States Supreme Court precedent . . . binds our Court as to questions of federal law.").

[29] Beyond that threshold disagreement, I agree with some other conclusions reached by the majority opinion.  Specifically, I agree that GACE bears the burden of showing that the Assessment is unlawful and that it must do so by showing that the Assessment's constitutional infirmities are clear and palpable.  And I agree that the nude dancing referenced in OCGA § 15-21-201 (1) (A) is a form of expressive conduct protected by the First Amendment, however minimally the United States Supreme Court has characterized that protection.  See, e.g., *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 565-566 (111 SCt 2456, 115 LE2d 504) (1991).

combat the negative effects of sexually oriented businesses on the surrounding community are to be evaluated as 'content-neutral' regulations, which are subject to intermediate scrutiny.").[30]

---

[30] As the majority opinion notes, the State Defendants contend that the Assessment is a tax rather than a regulation and is content-neutral rather than content-based, such that the Assessment is not subject to *any* restriction under the First Amendment. See Maj. Op. at 21. Because I conclude that the Assessment fails intermediate scrutiny, I will explain why I reject the Defendants' argument. (The majority opinion is able to avoid this explanation by only assuming that intermediate scrutiny applies.) In making their argument, the Defendants rely on *Leathers v. Medlock*, 499 U.S. 439 (111 SCt 1438, 113 LE2d 494) (1991), which held that a state's decision to extend its generally applicable sales tax to certain members of the press (cable and satellite television providers) while exempting another (print media), did not violate the First Amendment. See id. at 453 ("The Arkansas Legislature has chosen simply to exclude or exempt certain media from a generally applicable tax. Nothing about that choice has ever suggested an interest in censoring the expressive activities of cable television. Nor does anything in this record indicate that Arkansas' broad-based, content-neutral sales tax is likely to stifle the free exchange of ideas. We conclude that the State's extension of its generally applicable sales tax to cable television services alone, or to cable and satellite services, while exempting the print media, does not violate the First Amendment."). Based on *Leathers*, Defendants argue that a tax will run afoul of the First Amendment only if it (1) singles out the press, (2) targets only a small group of speakers, or (3) discriminates based on the content of taxpayer speech. See id. at 447 (discussing *Arkansas Writers' Project v. Ragland*, 481 U.S. 221 (107 SCt 1722, 95 LE2d 209) (1987); *Minneapolis Star and Tribune Co. v. Minnesota Commr. of Revenue*, 460 U.S. 575 (103 SCt 1365, 75 LE2d 295) (1983); and *Grosjean v. Am. Press Co.*, 297 U.S. 233 (56 SCt 444, 80 LE 660 (1936)). Defendants argue that because the Assessment does not fit within any of these categories, it is not subject to any scrutiny under the First Amendment. However, the categories *Leathers* outlined required the application of *strict* scrutiny, and it does not follow that the failure to fit in one of those three categories means that a regulation is subject to no scrutiny at all.

Where the majority opinion and I veer even further apart is in

---

The United States Supreme Court's analysis in *Turner Broadcasting System* illustrates this point. There, the Court considered a law that regulated the businesses of cable operators, which are "members of the press," by requiring them to carry certain stations. See 512 U.S. at 630, 659. The Court first considered whether this law was similar to the unconstitutional taxes imposed on the press in *Arkansas Writers' Project, Minneapolis Star & Tribune*, and *Grosjean*. Id. at 659-662. The Court held that the regulation, which was content-neutral, was not similar to the unconstitutional laws in those cases. See 512 U.S. at 661. Rather than conclude that the First Amendment did not apply, however, the Court concluded that the law was subject to intermediate scrutiny: "[T]he must-carry provisions do not pose such inherent dangers to free expression, or present such potential for censorship or manipulation, as to justify application of the most exacting level of First Amendment scrutiny. We agree with the District Court that the appropriate standard by which to evaluate the constitutionality of must-carry is the intermediate level of scrutiny applicable to content-neutral restrictions that impose an incidental burden on speech." Id. at 661-662.

Although *Turner Broadcasting System* dealt with a regulation of the cable providers' businesses, rather than the imposition of a direct tax, it illustrates that the United States Supreme Court has not treated the cases applying strict scrutiny for certain taxes on the press as a per se displacement of the intermediate scrutiny analysis it articulated in *O'Brien*. And although the Supreme Court has said, in the context of an equal-protection challenge, that "[l]egislatures have especially broad latitude in creating classifications and distinctions in tax statues," *Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 547 (103 SCt 1997, 76 LE2d 129) (1983), I am not convinced that this statement means that a legislature's discretion is so broad that taxes that expressly impose burdens on expression but are not subject to strict scrutiny because they are content-neutral somehow evade judicial scrutiny under the First Amendment altogether and are therefore automatically constitutional. To reach such a conclusion would contravene the cases from the United States Supreme Court and this Court directing us to apply intermediate scrutiny to laws like this Assessment—content-neutral laws that are aimed at addressing negative secondary effects and that incidentally burden expression. See, e.g., *City of Erie*, 529 U.S. at 289; *Maxim Cabaret*, 304 Ga. at 191-192.

the application of the *O'Brien* test. In particular, I disagree with the majority opinion's characterization of the State's interest in enacting the Assessment—especially because that characterization disregards that the State has made clear in numerous ways exactly what its interest is. Moreover, by recasting the State Defendants' stated interest in this case, the majority opinion has not given full effect to the test the United States Supreme Court has said must be applied in cases like this. And the majority opinion has instead endorsed an intermediate-scrutiny analysis that legitimizes governmental interests—even unstated governmental interests—that come perilously close to targeting protected expression.

(b) Under *O'Brien*'s intermediate-scrutiny test, a regulation is constitutional under the First Amendment if, among other things, it "furthers an important or substantial government interest" and the restriction on expression is "no greater than is essential to the furtherance of that interest." 391 U.S. at 377. The majority opinion describes the State's interest in enacting the Assessment as twofold. First, the majority opinion cites the text of the Act enacting the

66

Assessment to show that the State has evinced an interest in "'address[ing] the deleterious secondary effects . . . associated with adult entertainment establishments that allow the sale, possession, or consumption of alcohol'" and in funding "'a child protective response.'" Maj. Op. at 41 (citing Ga. L. 2015, p. 675 § 1-2). I readily agree that the State has expressed an interest in addressing the sexual exploitation of children and that this interest is "important or substantial." See Ga. L. 2015, pp. 675 § 1-2 ("[I]t is necessary and appropriate to adopt uniform and reasonable assessments and regulations to help address the deleterious secondary effects, including but not limited to, prostitution and sexual exploitation of children, associated with adult entertainment establishments that allow the sale, possession, or consumption of alcohol on premises and that provide to their patrons performances and interaction involving various forms of nudity."); id. ("The purpose of this Act is to protect a child from further victimization after he or she is discovered to be a sexually exploited child by ensuring that a child protective response is in place in this state."). And to serve that

interest, the State created the Safe Harbor for Sexually Exploited Children Fund, which may be used "for purposes of providing care, rehabilitative services, residential housing, health services, and social services . . . to sexually exploited children" and to fund "a person, entity, or program devoted to awareness and prevention of becoming a sexually exploited child." OCGA § 15-21-202 (c). All of this is clear from the Act and statute creating the Assessment.

But the majority opinion goes on to infer a second State interest. It does so in a way that I do not view as supported by the General Assembly's stated purpose or by United States Supreme Court precedent performing intermediate scrutiny analysis under *O'Brien*. In this regard, the majority opinion asserts that the State has an unsaid "important or substantial" interest in "imposing an assessment on the industry responsible for those secondary effects." Maj. Op. at 41. See also id. at 24 ("[I]mplicit within the State's interest is an element of seeking not to burden taxpayers in general with the costs of remedying the harm that the adult entertainment industry causes."); id. ("This element strikes us as clearly implicit

68

within the structure of the challenged statute."); id. at 41 ("The State's interest . . . includes requiring the industry that 'tend[s] to be the focal point[] of negative effects' to fund the remedy for the harm it creates[.]"); id. at 45 (characterizing this second interest as "ensuring that the industry responsible for that harm, i.e., adult entertainment establishments that serve alcohol, rather than the general public, pays for the remedy"). In so doing, the majority opinion has imputed on the State an interest that it has not itself asserted, in a way that is both novel and troubling.

(c) The record shows that the State has not asserted the second interest the majority opinion infers. The State has not asserted an interest in "ensuring that the industry responsible for that harm, i.e., adult entertainment establishments that serve alcohol, rather than the general public, pays for the remedy"—not in the Act, not in its appellate briefs, and not at oral argument before this Court. Instead, the Act expressly states: "The purpose of this Act is to protect a child from further victimization after he or she is discovered to be a sexually exploited child by ensuring that a child

69

protective response is in place in this state." Ga. L. 2015, p. 675.[31]

See also OCGA § 15-21-202 (c) (explaining that the money raised by the Assessment may be used "for purposes of providing care, rehabilitative services, residential housing, health services, and social services . . . to sexually exploited children" and to fund "a person, entity, or program devoted to awareness and prevention of becoming a sexually exploited child"). Thus, in the one place where the General Assembly expressed its purpose in enacting the Assessment, it stated that it *did* have an interest in "protect[ing] a child from further victimization after he or she is discovered to be a sexually exploited child by ensuring that a child protective response is in place in this state"—and it did *not* state that it had an interest in either directing the financial burden of its goals to the industry it determined was associated with child sexual exploitation or in shielding other taxpayers from the financial burden of funding the

---

[31] It further says that "[t]he purpose and intended effect" is not "to impose a restriction on the content or reasonable access to any materials or performances protected by the First Amendment of the United States Constitution or Article I, Section I, Paragraph V of the Constitution of this state."

Safe Harbor Fund.

The majority opinion asserts that it can infer this secondary purpose of "ensuring that the industry responsible . . . pays for the remedy" and "seeking not to burden taxpayers in general" from the "structure" of the Assessment itself, given that the General Assembly designed the Assessment to apply to adult entertainment establishments and—at least according to the majority opinion— made findings in the Act creating the Assessment "that adult entertainment establishments are responsible for this particular harm." Maj. Op. at 24, 45-46. But see Ga. L. 2015, p. 675 § 1-2 ("The General Assembly finds that a *correlation* exists between adult live entertainment establishments and the sexual exploitation of children.") (emphasis added).[32]    And the majority opinion asserts

---

[32] The evidence appears to support association or correlation, and does not speak in terms of causation. For example, the evidence included a study finding a "spatial correlation" between adult prostitution and juvenile prostitution as well as a "spatial association" between "prostitution-related activities and legal adult sex venues" and a study indicating that adult entertainment venues "frequently serve as a stepping stone to prostitution." See also Ga. L. 2015, p. 675 § 1-2 (finding that "adult live entertainment establishments present a point of access for children to come into contact with individuals seeking to sexually exploit children. The General Assembly further

that failing to infer such an interest would render the General Assembly's findings "meaningless." Maj. Op. at 45-46. However, we need not glean from these findings an unstated governmental purpose to give them meaning: the General Assembly's findings serve the important purpose of showing that the Assessment is intended to address negative secondary effects of adult entertainment establishments featuring certain protected expression, rather than aimed at suppressing the protected expression itself. And indeed, the majority opinion underscores this point in its discussion of *O'Brien*'s second prong, in which it considers the evidence presented to the General Assembly to support its specific findings that there is a connection between adult entertainment establishments and child sexual exploitation. Maj.

---

finds that individuals seeking to exploit children utilize adult live entertainment establishments as a means of locating children for the purpose of sexual exploitation."). But I need not decide whether I agree with the majority opinion's conclusion that this evidence is sufficient to meet the (admittedly low) standard of "very little evidence" that is required to support the General Assembly's findings, because I would conclude that the Assessment is unconstitutional under *O'Brien*. I am nonetheless troubled by the low quantum of circumstantial evidence that the majority concludes is sufficient to meet the evidentiary standard here.

Op. at 26-34. These findings demonstrate that although the Assessment pertains to a specific type of expression (nude dancing), the General Assembly's reason for this targeting was not a desire to suppress the expression, but rather a desire to address negative secondary effects that result from it. And in any event, these findings do not override the General Assembly's stated purpose in enacting the Assessment: to provide services to children who have been sexually exploited and to prevent further sexual exploitation of children.

Likewise, the State Defendants[33] have never asserted on appeal that holding adult entertainment establishments—and only such establishments—financially responsible for sexually exploited children was itself an "important or substantial" government interest. Instead, in their brief to this Court, the State Defendants describe the State's interest as "combatting child sex trafficking," "combatting the sexual exploitation of children," and "protecting

---

[33] As explained in the majority opinion, the defendants here are the State of Georgia and the State Revenue Commissioner, in his individual capacity.

victims of child sex exploitation."

It is true—as the majority opinion points out—that in oral argument before this Court, an attorney for the State Defendants stated that "the State is trying to mitigate the negative social effects caused by these businesses. *The narrow tailoring* is that it is taxing the businesses that are associated with that negative social impact." Maj. Op. at 45 n.21 (emphasis added). The majority opinion errs, however, by recasting this statement as the State's interest (the second prong of the *O'Brien* test), when the State's own lawyer made clear that it pertained to efforts the State made to tailor the restriction on expression caused by the Assessment (the fourth prong of the *O'Brien* test). And that latter explanation—that the statement pertains to narrow tailoring—makes good sense; after confirming the State's interest in "mitigat[ing] the negative social effects" of child sexual exploitation, the State's lawyer had to then go on to explain just how the restriction on expression was narrowly tailored to serve that State interest. Indeed, one of the State Defendants' main arguments on appeal—both in appellate briefing

74

and in oral argument—is that the Assessment is narrowly tailored to serve the State's interest of protecting victims of child sexual exploitation because the Assessment affects only the businesses associated with the negative secondary effects. The State Defendants do not argue—as the majority opinion concludes—that the State has an "important or substantial" interest in taxing a particular industry or a defined subset of businesses.

Additionally, the interest asserted by the majority opinion is novel to the parties in this case, and it is notable that the trial court did not conclude that the State had such an interest.[34] Instead, the trial court, pointing to the expressed interest of the General Assembly and the characterizations of that State interest made by

[34] The majority opinion asserts that the trial court validated the State's implicit interest in "seeking not to burden taxpayers in general with the costs of remedying the harm that the adult entertainment industry causes" because the court said: "In other words, GACE is essentially asking the state to subsidize them by covering the costs of mitigating the secondary effects of their own operations." Maj. Op. at 25. Unlike the majority opinion, I view that statement as the trial court's characterization and not as a summary of the State's asserted interest. And in any event, the trial court does not indicate at any place in its order that the State's interest includes shielding taxpayers from financial burdens associated with the State's interest in providing services to child victims of sexual exploitation.

75

the State Defendants, concluded that the Assessment "further[s] an important governmental interest in reducing sex trafficking and the exploitation of minors," "promote[s] the important governmental interest in providing protection and rehabilitation of victims of child sex trafficking and child sexual exploitation by raising revenue and directing that revenue towards such programs," and "advances Georgia's interest in combatting the sexual exploitation of children with the proceeds of the Safe Harbor Fund."[35]

In sum, I do not agree that the State has proffered "imposing an assessment on the industry responsible for those secondary effects" as the substantial interest the Assessment serves, and I do not think it is legally supported to infer or otherwise supply for the State a substantial interest in this context, where we are applying

---

[35] It is also important to point out that the majority opinion does not conclude that the Assessment passes intermediate scrutiny, and is thus constitutional, on the basis of the State's expressly stated (or "first") interest alone. In other words, the majority opinion does not conclude that an interest in combatting sexual exploitation of children or protecting children from sexual exploitation passes muster under *O'Brien*. It is only when that interest is coupled with shouldering a particular industry with the financial obligations that result from the State's policy goals that the State interest passes *O'Brien*'s intermediate-scrutiny test.

*O'Brien* and the State has expressly offered a substantial interest that satisfies the second prong of that test. See, e.g., *City of Erie*, 529 U.S. at 289 (considering "the governmental purpose in enacting the regulation"); *Goldrush II*, 267 Ga. at 692 (considering "the stated purpose of the ordinance amendment").[36]

2. *In determining whether a regulation passes intermediate scrutiny, the majority opinion points to no other court that has characterized an "important or substantial" governmental interest in the way the majority opinion has.*

In crafting the State interest in this case, the majority opinion has cited no binding authority from the United States Supreme Court (or persuasive authority from other courts) that either provides a governmental interest different from the one asserted by the government when applying the *O'Brien* test or characterizes a State's interest in the way the majority opinion does here. To that end, the majority opinion asserts that the State has an "important

---

[36] It appears that in *Goldrush II*, this Court considered challenges raised under both the Georgia and United States Constitutions. See *Goldrush II*, 267 Ga. at 690 (applying both State and federal precedents to determine whether "a statute or ordinance which allegedly impinges upon the constitutionally-guaranteed right of free speech and expression").

77

or substantial" governmental interest in "ensuring that the industry responsible for that harm, i.e., adult entertainment establishments that serve alcohol, rather than the general public, pays for the remedy." But as far as I can tell, no other state or court has framed a state's interest this way. To the contrary, the "important or substantial" governmental interests discussed in United States Supreme Court precedents applying *O'Brien* generally are framed in terms of alleviating or mitigating a problem, including mitigating secondary effects of certain protected expression—but not in terms of financially targeting a particular industry, even to serve an otherwise legitimate policy goal. See, e.g., *City of Erie*, 529 U.S. at 296 ("The asserted interests of regulating conduct through a public nudity ban and of combating the harmful secondary effects associated with nude dancing are undeniably important."); *City of Renton*, 475 U.S. at 50, 52 (describing the substantial governmental interest served by the zoning ordinance as "preserv[ing] the quality of urban life"); *Ward*, 491 U.S. at 796-797 ("We think it also apparent that the city's interest in ensuring the sufficiency of sound

78

amplification at bandshell events is a substantial one.  The record indicates that inadequate sound amplification has had an adverse effect on the ability of some audiences to hear and enjoy performances at the bandshell.  The city enjoys a substantial interest in ensuring the ability of its citizens to enjoy whatever benefits the city parks have to offer, from amplified music to silent meditation."); *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 296 (104 SCt 3065, 82 LE2d 221) (1984) ("It is also apparent to us that the regulation narrowly focuses on the Government's substantial interest in maintaining the parks in the heart of our Capital in an attractive and intact condition, readily available to the millions of people who wish to see and enjoy them by their presence."); *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 67 (126 SCt 1297, 164 LE2d 156) (2006) ("Military recruiting promotes the substantial Government interest in raising and supporting the Armed Forces."); *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 816-817 (104 SCt 2118, 80 LE2d 772) (1984) (noting the city's

79

"esthetic interest in avoiding 'visual clutter'"); *McCullen v. Coakley*, 573 U.S. 464, 486-487 (134 SCt 2518, 189 LE2d 502) (2014) ("[R]espondents claim that the Act promotes public safety, patient access to healthcare, and the unobstructed use of public sidewalks and roadways. Petitioners do not dispute the significance of these interests. We have, moreover, previously recognized the legitimacy of the government's interests in ensuring public safety and order, promoting the free flow of traffic on streets and sidewalks, protecting property rights, and protecting a woman's freedom to seek pregnancy-related services.") (citations and punctuation omitted). See also, e.g., *Maxim Cabaret*, 304 Ga. at 193 (addressing a challenge under the United States and Georgia Constitutions and explaining that "attempting to preserve the quality of urban life and reducing criminal activity and preventing the deterioration of neighborhoods" are "important government interests") (cleaned up); *Gravely v. Bacon*, 263 Ga. 203, 205 (429 SE2d 663) (1993) (addressing the United States and Georgia Constitutions and explaining: "Gravely does not dispute that the Smyrna ordinance

80

furthers the important government interests in reducing criminal activity and protecting the deterioration of neighborhoods engendered by adult entertainment establishments").

Even the two state supreme courts that have upheld under intermediate scrutiny taxes or fees similar to the Assessment (and which the majority opinion cites as persuasive authority) do not characterize the state's interest in the way the majority opinion does here. See *Bushco v. Utah State Tax Comm'n*, 225 P3d 153, 167 (Utah 2009) ("[T]he record supports the conclusion that the Tax is directed toward the substantial state interest of providing treatment for sex offenders, with the twin goals of rehabilitation and prevention of future offenses. It is also clear that the Tax furthers that interest by raising revenue that is specifically directed toward sex offender treatment programs."); id. at 168 ("In this case, the Tax promotes the interest in providing treatment for sex offenders by raising revenue and directing that revenue towards treatment programs."); *Combs v. Texas Ent. Ass'n, Inc.*, 347 SW3d 277, 288 (Tex. 2011) ("The State has an important interest in reducing the secondary effects of

81

adult businesses.").[37]

_____

[37] The majority opinion notes that its "holding . . . is consistent with the holdings of every appellate court decision [it has] found addressing similar claims about similar assessments." Maj. Op. at 49 n.25. It is true that the majority opinion's bottom line—that is, upholding a government tax or assessment directed at adult entertainment establishments—is the same bottom line reached by the Utah and Texas Supreme Courts in *Bushco* and *Combs*. But the *reasoning* of the Utah and Texas courts was materially different, in large part because those courts identified state interests unlike the one the majority opinion has identified here. See, e.g., *Bushco*, 225 P3d at 168-169 (concluding that a tax on receipts of businesses whose employees performed services while fully or partially nude passed the *O'Brien* intermediate-scrutiny test because, among other reasons, "the Tax promotes the interest in providing treatment for sex offenders by raising revenue and directing that revenue towards treatment programs" and "the Tax places less of a burden on protected expression than the ordinance upheld in *Erie*"); *Combs*, 347 SW3d at 288 (concluding that a $5 fee for each customer of an establishment that allowed the consumption of alcohol and also offered live nude entertainment served the state's interest in reducing secondary effects such as "rape, sexual assault, prostitution, disorderly conduct, and a variety of other crimes and social ills" because it "provides some disincentive to present live nude entertainment where alcohol is consumed" and the restriction on speech passed *O'Brien*'s intermediate scrutiny test because the fee "is a minimal restriction on the businesses, . . . [a]nd the business that seeks to avoid the fee need only offer nude entertainment without allowing alcohol to be consumed"). Given that the legal reasoning contained in the majority opinion does not mirror the legal reasoning in *Bushco* and *Combs*, citing those two cases to bolster the majority opinion is unpersuasive, to say the least.

The majority opinion also asserts that its holding is consistent with the holding reached by the Nevada Supreme Court in dealing with a broad tax on live entertainment. See *Deja Vu Showgirls of Las Vegas, LLC v. Nev. Dep't of Taxation*, 334 P3d 392, 399-402 (Nev. 2014) (explaining that "over 90 live-entertainment facilities were subject to" the tax, "including raceways, nightclubs, performing arts centers, gentlemen's clubs, and facilities hosting sporting and one-time events"). The outcome of that case is indeed the same as the one in this case, insofar as the Nevada tax was held to be constitutional. But the reasoning employed by the Nevada court was very different, including

3.      *The majority opinion's characterization of the State's interest undermines* O'Brien*'s four-prong test and creates potential work-arounds for government entities to target protected expression.*

As discussed above, the *O'Brien*'s test includes four prongs: "[1] if it is within the constitutional power of the Government; [2] if it furthers an important or substantial governmental interest; [3] if the governmental interest is unrelated to the suppression of free expression; and [4] if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." 391 U.S. at 377. Importantly, the second prong asks *what* that government's interest is, and the fourth

---

because the court applied only rational-basis review:
> Because [the tax] does not discriminate on the basis of the content of taxpayer speech, target a small group of speakers, or otherwise threaten to suppress ideas or viewpoints, we determine that heightened scrutiny does not apply. Instead, rational basis review applies, and the statute is presumed to be constitutional. We conclude that [the tax] is constitutional on its face because appellants have failed to demonstrate that [the tax] is not rationally related to a legitimate government purpose.

Id. at 401. The majority opinion's legal reasoning does not rely on this case for guidance, and I likewise view its reasoning as inapplicable. See id. at 400 (concluding, among other things, that the exceptions to the tax did not discriminate based on content, because the exemptions applied not only to "family-oriented" performances, but also "adult-oriented live entertainment, such as boxing and charity events," and the tax did apply to "[m]any facilities providing what appellants would classify as family-oriented live entertainment, . . . including concert venues, circuses, and fashion shows").

prong asks the distinct question of *how* the State achieves that interest. By concluding that the government has a "substantial or important" interest in ensuring that a negative secondary effect is mitigated *in a certain way*, the majority opinion collapses these distinct inquiries, merging the "what" question in the second prong with the "how" question of the fourth. And by treating the targeting of the establishments that are engaging in protected expression as an "important or substantial" governmental interest, the majority opinion also fails to give full consideration to *O'Brien*'s third prong.

My concern about the majority opinion's failure to give meaning to all parts of the test is not merely formalistic; the separate parts of the test each serve an important function in the test the United States Supreme Court has articulated to ensure that the protections enshrined in the First Amendment are safeguarded in contexts like these. To illustrate why this is important, consider the governmental interest asserted in this case by the General Assembly and the State Defendants—which is also the governmental interest the trial court validated below. There is no

dispute that the State has a legitimate interest in "protect[ing] a child from further victimization after he or she is discovered to be a sexually exploited child by ensuring that a child protective response is in place in this state," in "protecting victims of child sex exploitation," and in "providing protection and rehabilitation of victims of child sex trafficking and child sexual exploitation by raising revenue and directing that revenue towards such programs." In fact, like the parties challenging regulations in many of the cases cited above, GACE has not disputed that the interest offered by the State is "important or substantial."

But it seems more likely that GACE would dispute that the State has an "important or substantial" interest in protecting children from sexual exploitation and providing them services *by levying taxes against adult entertainment establishments*.[38]

---

[38] Of course, GACE has not had an opportunity to respond to a governmental interest couched in these terms, given that it is only the majority opinion that has articulated the State's interest in this way. Likewise, the trial court did not make findings on a governmental interest of this type. See also footnote 8.

Whatever legitimate interest the State has in helping child victims of sexual exploitation (an interest no one disputes), I cannot say that interest necessarily remains "important or substantial" when extended to "ensuring that the industry responsible for that harm, i.e., adult entertainment establishments that serve alcohol, rather than the general public, pays for the remedy."[39]  Maj. Op. at 45. Indeed, that version of a governmental interest sounds alarmingly close to a State asserting that it has an interest in *targeting expression* that is the cause of the secondary effect (here, nude dancing)—an interest that the General Assembly and the State Defendants have (wisely) disclaimed here.[40]  By clouding the

---

[39] As noted above in footnote 7, the majority opinion has not pointed to any record evidence that supports the assertion that adult entertainment establishments cause sexual exploitation of children.

[40] At oral argument before this Court, the Defendants expressly rejected the notion that the Assessment was designed to discourage nude dancing or to discourage people from visiting adult entertainment establishments featuring nude dancing and alcohol.  And if the Defendants had made such an argument, it would further imperil the validity of the Assessment by conceding that the State's interest was in burdening expression (and not merely addressing secondary effects of expression) engaged in by adult entertainment establishments selling alcohol.  To that end, such an argument—that the government interest is regulating establishments that feature certain

question of what the State's interest is with how the State effectuates that interest, the majority opinion does not fully grapple with whether the government interest at issue in this case is truly an "important or substantial" governmental interest that is "unrelated to the suppression of free expression." See *O'Brien*, 391 U.S. at 377.[41]

That is why the governmental interest question should remain separate from the question of whether the restriction on speech is narrowly tailored here. If we conclude that the State has an interest in accomplishing a policy objective (such as providing services to

---

expression and allow or sell alcohol—would place the Assessment in danger of failing *O'Brien*'s third prong: if the interest is to discourage the performance or viewing of nude dancing (i.e., protected expression) at such establishments, then the interest is not "unrelated to the suppression of free expression." See *O'Brien*, 391 U.S. at 377. Compare *Goldrush II*, 267 Ga. at 692-693 (concluding that an ordinance prohibiting adult entertainment establishments from selling alcohol was targeted at the secondary effects of adult entertainment establishments and passed intermediate scrutiny because it was aimed at serving the government interest of "control[ing] criminal behavior and prevent[ing] undesirable community conditions").

[41] As explained more below, this also highlights why the majority opinion's tailoring argument is problematic: focusing on tailoring, while at the same time ignoring the potential targeting of protected expression, can lead to circumvention of the constitutional protections *O'Brien* attempted to safeguard.

child victims of sexual exploitation) in a *certain manner* (such as by taxing adult entertainment establishments), then of course the tailoring requirement is met: the only way to serve the specific interest of taxing clubs featuring nude dancing is to tax those clubs. Allowing this maneuvering in determining the State's interest thus renders the tailoring question essentially nugatory: if the governmental interest includes not only addressing a societal ill, but also addressing it in a specific way, a court can always shape the governmental interest in a way that ensures the regulation is narrowly tailored—even when the government entity has not couched its interest in this way, and even when the governmental interest, if couched in that way, would veer towards targeting expression or speech. I see no evidence in *O'Brien*, or in the precedents from the United States Supreme Court and this Court applying *O'Brien*, that casting or re-casting a State's interest in this way is permissible.

This concern is exacerbated where, as here, "'very little evidence is required'" for a state legislature to connect protected

expression and a negative secondary effect. See Maj. Op. at 28 (quoting *Alameda Books*, 535 U.S. at 451 (Kennedy, J., concurring)). This low evidentiary standard, coupled with the majority opinion's conclusion that the government can have a "substantial or important" interest in imposing financial burdens on a particular industry—even an industry that involves protected expression— could lead to government entities levying taxes so severe that it could eliminate a disfavored industry (and its protected expression) altogether. On this point, the majority opinion articulates no limiting principle that would prohibit a tax or assessment far greater than the one at issue in this case; that would prevent a government entity from targeting for complete elimination protected expression through a tax or assessment of the type in this case; or that would prevent government entities from taxing other businesses, groups, or individuals who engage in disfavored—but protected—expression in an effort to eliminate that speech or expression altogether. And the government would be permitted to do so based solely on the type of anecdotal testimony and attenuated

findings the majority opinion acknowledges meet the bare-minimum evidentiary standard in this case.[42]  By framing the State's interest in enacting the  Assessment in this way, the majority opinion paves the way for a work-around of the *O'Brien* test that would allow state legislatures and other government entities to target protected expression by framing their interest in enacting a tax as including the government's chosen method of targeting certain businesses with that tax.  This cuts at the very core of the First Amendment's protection to prevent the government from suppressing or

---

[42] The majority opinion concludes as part of its analysis of *O'Brien*'s fourth prong that "any burdens on protected expression are relatively de minimis" in part because the Assessment "is significantly less burdensome than similar taxes upheld by other courts."  Maj. Op. at 46-47.  But if the State has an interest in "ensuring that the industry responsible for that harm, i.e., adult entertainment establishments that serve alcohol, rather than the general public, pays for the remedy," then requiring adult entertainment establishments to pay an even more substantial percentage of their profits would still be narrowly tailored to serve that interest—at least according to the *O'Brien* analysis the majority opinion articulates here.

The majority opinion also notes that all of the money gained from the Assessment is directed to the Safe Harbor Fund to contend that "no portion of the burden on speech that the Assessment imposes does not serve to advance the State's goals."  Maj. Op. at 42-43.  But whether the funds raised by the Assessment are directed to the Safe Harbor Fund, as opposed to the State's General Fund, does not answer whether it is proper in the first place to define the state's substantial interest as "ensuring that the industry responsible for that harm, i.e., adult entertainment establishments that serve alcohol, rather than the general public, pays for the remedy."

90

eliminating disfavored expression and speech.

4. *The State's interest in passing the Assessment, when properly viewed, fails* O'Brien's *fourth prong.*

(a) Rather than blazing the trail that the majority opinion does, I would conclude that the "important or substantial" governmental interest in passing the Assessment is what the General Assembly says it was: to "protect a child from further victimization after he or she is discovered to be a sexually exploited child by ensuring that a child protective response is in place in this state." Ga. L. 2015, p. 675, § 1-2. See also OCGA § 15-21-202 (c) (establishing a fund created by the Assessment to be used "for purposes of providing care, rehabilitative services, residential housing, health services, and social services . . . to sexually exploited children" and to fund "a person, entity, or program devoted to awareness and prevention of becoming a sexually exploited child"). And when the State's interest is viewed in this way, the Assessment fails the fourth prong of *O'Brien*'s intermediate-scrutiny test because it is not narrowly tailored to serve the asserted government interest.

91

(b) I begin my analysis of the fourth prong by following United State Supreme Court precedent and articulating the final prong of *O'Brien*'s intermediate scrutiny test as the United States Supreme Court articulated it in *O'Brien* and later cases following *O'Brien*: a regulation does not violate the First Amendment "if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." 391 U.S. at 377. See also, e.g., *City of Erie*, 529 U.S. at 301 (describing "[t]he fourth and final *O'Brien* factor" as "that the restriction is no greater than is essential to the furtherance of the government interest"); *Turner Broad. Sys.*, 512 U.S. at 662 (same).[43] This means that there must

---

[43] I disagree with the majority opinion's apparent assertion that by applying the language *O'Brien* used to describe the fourth prong, I am misinterpreting the test. See Maj. Op. 36-37. I also disagree that I am applying a "least restrictive or least intrusive means" requirement, as I explain below.

Moreover, to the extent the majority opinion sees a difference between the fourth prong articulated in *O'Brien* and the test articulated in *Ward*, see Maj. Op. at 35-36, the Eleventh Circuit has opined that the requirement that regulation of expressive conduct may be 'no greater than is essential to the furtherance of [the government's] interest'" in *O'Brien* and the requirement that a time, place, manner restriction on speech is "'not substantially broader than necessary to achieve the government's interest'" in *Ward* are "*generally* the same," but "in the occasional case, there may be a difference between 'not

be a "close fit" between the burdening of expression and the government purpose, *McCullen*, 573 U.S. at 464, and that a "substantial portion of the burden" on expression must serve to advance the government's goals, *Ward*, 491 U.S. at 798-799. In other words, expression cannot constitutionally be burdened if that burden is not furthering the government interest. This test allows some burden on expression (i.e., an incidental effect) as long as the burden itself serves the government's important, non-expression-related purpose.

(c) Cases engaging in an analysis of *O'Brien*'s fourth prong show that the burden on expression must serve the important or substantial governmental interest asserted. In *O'Brien*, the Court held that a law prohibiting the destruction of draft cards was constitutional, holding as to the tailoring question: "We perceive no

---

substantially broader' and 'no greater than is essential.'" *Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F3d 1358 (11th Cir. 1999), at 1363 (emphasis in original). Even assuming that is true, the majority opinion has not explained why this case is that rare case in which such a difference has materialized, nor does it explain why—if there is a difference—we should apply the test applicable to time, place, manner restriction discussed in *Ward* rather than the test applicable to content-neutral regulations on conduct discussed in *O'Brien*.

alternative means that would more precisely and narrowly assure the continuing availability of issued Selective Service certificates than a law which prohibits their wilful mutilation or destruction." 391 U.S. at 381. Similarly, in *Ward*, the Court held constitutional a requirement that performers in a certain public concert venue use sound equipment provided and controlled by the city because "the city's substantial interest in limiting sound volume is served in a direct and effective way by the requirement that the city's sound technician control the mixing board during performances. Absent this requirement, the city's interest would have been served less well." 491 U.S. at 800.

In *Members of City Council of City of Los Angeles*, the United States Supreme Court examined whether and how burdens on expression imposed by an anti-billboard ordinance and an anti-leaflet ordinance served the governmental interests in explaining why the anti-billboard ordinance was constitutional but the anti-leaflet ordinance was not. See 466 U.S. at 810. The Court explained that the anti-billboard ordinance was sufficiently tailored to serve

the government interest in "avoiding visual clutter" because "it is the tangible medium of expressing the message [i.e., the billboards] that has the adverse impact on the appearance of the landscape," so an ordinance prohibiting billboards "responds precisely to the substantive problems which legitimately concern[] the City" and "curtails no more speech than is necessary to accomplish its purpose." 466 U.S. at 810. By contrast, the anti-leaflet ordinance meant to address littering was unconstitutional because "an antilittering statute could have addressed the substantive evil without prohibiting expressive activity," and the anti-leaflet rule "gratuitously infringed upon the right of an individual to communicate with a willing listener." Id. Likewise, in *McCullen v. Coakley*, the United States Supreme Court held that a law creating a buffer zone around abortion clinics to "ensur[e] public safety outside abortion clinics, prevent[] harassment and intimidation of patients and clinic staff, and combat[] deliberate obstruction of clinic entrances" was unconstitutional because it "burden[ed] substantially more speech than necessary to achieve the

95

Commonwealth's asserted interests." 573 U.S. at 490-491. The Court explained that Massachusetts had "available to it a variety of approaches that appear capable of serving its interests, without excluding individuals from areas historically open for speech and debate," such as providing for criminal punishment of "[a]ny person who knowingly obstructs, detains, hinders, impedes, or blocks another person's entry to or exit from a reproductive health care facility." Id. at 491, 494.

(d) Against this backdrop of binding precedent, I conclude that the Assessment fails the fourth prong of *O'Brien*'s test because the burden on protected expression does not serve the interest of providing services to child victims of sexual exploitation. In particular, I cannot say that the element of the Assessment that burdens expression—that is, its specific application to adult entertainment establishments showcasing the protected expression of nude dancing—serves the stated government interest of providing services to help sexually exploited children.

Unlike in *O'Brien*, where prohibiting the expressive activity of

96

destroying a draft certificate "precisely and narrowly assure[d] the continuing availability" of the certificates, 391 U.S. at 381, or in *Ward*, where mandating the use of certain sound equipment served the city's interest in limiting sound volume "in a direct and effective way," 491 U.S. at 800, there is no "precise" or "direct" connection between burdening protected speech (i.e., nude dancing) and providing "care, rehabilitative services, residential housing, health services, and social services" for "sexually exploited children." See OCGA § 15-21-202 (c).

Moreover, there is no indication that the State would provide services to sexually exploited children or engage in preventative efforts less effectively if those services and prevention programs were funded by a generally applicable tax, rather than one directed at establishments featuring certain types of protected expression. Compare *Rumsfeld*, 547 U.S. at 67 (holding that the State's interest in raising and supporting the armed forces would be served "less effectively" without a law requiring that they be given equal access to campus recruiting). And the United States Supreme Court has

explained that general revenue taxes do not raise the same kind of First Amendment concerns as those raised by taxes that, by definition or in practice, burden a specific kind of expression. See, e.g., *Minneapolis Star and Tribune*, 460 U.S. at 586 (explaining that the interest of "the raising of revenue," "[s]tanding alone, . . . cannot justify the special treatment of the press, for an alternative means of achieving the same interest without raising concerns under the First Amendment is clearly available: the State could raise the revenue by taxing businesses generally, avoiding the censorial threat implicit in a tax that singles out the press").[44]

The majority opinion asserts that considering whether the State could serve its interest without burdening expression at all "is simply an effort to smuggle the least restrictive means requirement from strict scrutiny into intermediate scrutiny." Maj. Op. at 43. And

---

[44] As explained in the majority opinion, *Minneapolis Star and Tribune* applied a form of strict scrutiny rather than *O'Brien*'s intermediate scrutiny test. See *Minneapolis Star and Tribune*, 460 U.S. at 585. However, the United States Supreme Court's determination that general revenue taxes generally do not burden expression as protected by the First Amendment was not dependent on the application of strict (rather than intermediate) scrutiny.

it is, of course, true that the intermediate-scrutiny requirements for tailoring (i.e., "if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of [the governmental] interest," *O'Brien*, 391 U.S. at 377), at least partially resemble the more stringent strict-scrutiny requirements (i.e., whether "the restriction furthers a compelling interest and is narrowly tailored to achieve that interest," *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (135 SCt 2218, 192 LE2d 236) (2015)). But any complaint about the similarities (or perhaps lack of dissimilarities) between those two tests should be directed at the United States Supreme Court, and not at applications of the intermediate-scrutiny test as that Court articulated it with respect to questions of federal constitutional law. And it is that intermediate scrutiny test that I apply here, evaluating whether "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of [the governmental] interest," *O'Brien*, 391 U.S. at 377, not whether the Assessment is "the least restrictive or least intrusive means" of "serv[ing] the

government's legitimate, content-neutral interests," *Ward*, 491 U.S. at 799.

In service of that analysis, I note that the State could serve its interests without burdening any expression to illustrate that the Assessment's restriction on protected expression, even if it seems minimal at first blush, is "greater than is essential to the furtherance of" the State's interest. See *O'Brien*, 391 U.S. at 377. See also id. at 381 ("We perceive no alternative means that would more precisely and narrowly assure the continuing availability of issued Selective Service certificates than a law which prohibits their wilful mutilation or destruction."); *McCullen*, 573 U.S. at 490-494 (2014) (concluding that the regulation failed the final prong of intermediate scrutiny because the state had "available to it a variety of approaches that appear capable of serving its interests, without excluding individuals from areas historically open for speech and debate"). That is the question that *O'Brien* articulates, and it is the question I have asked in conducting an intermediate-scrutiny

analysis under *O'Brien* here.[45]

---

[45] The majority opinion muses that I have failed to explain "how the Assessment is more offensive to the First Amendment than the multitude of regulations and ordinances banning the combination of alcohol and nude dancing that we have previously upheld."  Maj. Op. at 26 n.11.  I agree with the majority opinion that "[s]erving alcohol is not itself protected expression," *Oasis Goodtime Emporium, I.*, 297 Ga. at 525, and nothing I have said in this dissenting opinion asserts or implies otherwise.  I strongly disagree, however, that the Assessment should be upheld simply because it is purportedly less severe than other government regulations on adult entertainment establishments that serve alcohol, and the majority opinion offers no legal analysis for why that must be so.

And the cases from this Court that the majority opinion cites on this point do not advance its argument: the government regulations at issue in those cases  were designed to serve the important or substantial government purpose of decreasing the presence of negative secondary effects of the combination of alcohol and nude dancing—not to serve the important or substantial government purpose of providing services to victims of child sexual exploitation.  See *Gravely*, 263 Ga. at 205 (concluding that an ordinance prohibiting the sale of alcohol at "erotic dance establishments" served the government interest of "reducing criminal activity and protecting the deterioration of neighborhoods engendered by adult entertainment establishments"); *Goldrush II*, 267 Ga. at 692-693 (holding that the ordinance prohibiting adult entertainment establishments from selling alcohol served the government interest of "control[ing] criminal behavior and prevent[ing] undesirable community conditions").  See also *Maxim Cabaret,* 304 Ga. at 193 ("The City's prohibition of alcohol in nude dancing establishments thus meets the first prong of the *Paramount Pictures* test because it furthers the important government interests of attempting to preserve the quality of urban life, and reduc[ing] criminal activity and prevent[ing] the deterioration of neighborhoods.") (citation and punctuation omitted); *Oasis Goodtime Emporium*, 297 Ga. at 525 (addressing a challenge under the Georgia Constitution to a regulation prohibiting alcohol in sexually oriented businesses which the City enacted "minimize and control" the "deleterious secondary effects" of sexually oriented businesses that "are often associated with crime and adverse effects on surrounding properties"); *Trop, Inc. v. City of Brookhaven*, 296 Ga. 85, 88 (764 SE2d 398) (2014) (applying the *Paramount*

Like the government entities imposing the anti-leaflet tax discussed in *Members of City Council of City of Los Angeles*, see 466 U.S. at 810, and the buffer zone in *McCullen*, see 573 U.S. at 490-494, the governmental entity here (the State) has available to it another way to serve its interest of providing services to child

---

*Pictures* test to conclude that the ordinance "prohibit[ing] the sale of alcohol in sexually-oriented businesses and allow[ing] only semi-nudity" served the government purpose of attempting to preserve the quality of urban life and reduc[ing] criminal activity and prevent[ing] the deterioration of neighborhoods") (citations and punctuation omitted); *Chambers v. Peach County, Ga.*, 268 Ga. 672, 674 (492 SE2d 191) (1997) ("The ordinance [prohibiting the sale or consumption of alcohol at adult entertainment establishments] meets the *Paramount [Pictures]* criteria in that it furthers important governmental interests (the reduction of crime and the protection of property values).")

Moreover, in all of those cases, the burden on expression caused by the law or ordinance was, in fact, necessary to serve the governmental purpose because the government interest of reducing the crime that was a negative secondary effect of the combination of nude dancing and alcohol was directly served by eliminating that combination. See, e.g., *Gravely*, 263 Ga. at 205; *Goldrush II*, 267 Ga. at 692-693. And the effect on expression was not greater than necessary because the law did not impose limitations on other kinds of expression not associated with the crime the governments sought to reduce. See *Gravely*, 263 Ga. at 205 (explaining that the ordinance "impacts only those modes of expression which, in the experience of local governments, tend to be the focal points of negative effects such as increased crime"); *Goldrush II*, 267 Ga. at 692-693 (explaining that the ordinance was "limited to the modes of expression implicated in the production of negative secondary effects—those establishments that provide alcohol . . . and adult entertainment—thereby exempting mainstream performance houses, museums, or theaters"). That reasoning does not apply in this case, where the Assessment is designed to serve the government interest of providing services to victims of child sexual exploitation.

victims of sexual exploitation without imposing any burden on protected expression. And that leads me to the conclusion that the Assessment imposes an "incidental restriction" on "First Amendment freedoms" that is "greater than is essential to the furtherance of" the State's interest of providing services for sexually exploited children, and that the Assessment fails the fourth prong of the *O'Brien* intermediate-scrutiny test. See 391 U.S. at 377.

*

Because the Assessment as imposed on "adult entertainment establishments" defined in OCGA § 15-21-201 (1) (A) does not survive intermediate scrutiny under *O'Brien*, I would conclude that it violates the First Amendment to the United States Constitution. I would therefore reverse the trial court's order denying summary judgment to GACE and granting summary judgment to the Defendants.

103